# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before the Court sitting *En Banc*[1]

**UNITED STATES, Appellee**

v.

**Major NIDAL M. HASAN**
**United States Army, Appellant**

ARMY 20130781

Headquarters, III Corps and Fort Hood
Gregory A. Gross and Tara A. Osborn, Military Judges
Colonel Stuart W. Risch, Staff Judge Advocate

For Appellant: Captain Brian A. Osterhage, JA (argued); Jonathan F. Potter, Esquire (argued); Jonathan F. Potter, Esquire; Major Jack D. Einhorn, JA (on brief); Jonathan F. Potter, Esquire; Major Jack D. Einhorn, JA; Captain Roman W. Griffith, JA (on reply briefs and supplemental brief).

For Appellee: Captain Allison L. Rowley, JA (argued); Lieutenant Colonel Wayne H. Williams, JA; Major Jonathan S. Reiner, JA; Captain Allison L. Rowley, JA (on brief); Lieutenant Colonel Wayne H. Williams, JA; Major Jonathan S. Reiner, JA; Captain Christopher T. Leighton, JA; Captain Allison L. Rowley, JA (on response to supplemental brief).

11 December 2020

---

OPINION OF THE COURT

---

BROOKHART, Senior Judge:

On 5 November 2009, at Fort Hood, Texas, appellant fired into a crowd of soldiers attending a pre-deployment Solder Readiness Processing (SRP) in a building dedicated to that purpose. Appellant's attack killed thirteen individuals and wounded thirty-two.

---

[1] Chief Judge Escallier, Senior Judge Burton, Senior Judge Aldykiewicz, Judge Fleming, and Judge Walker took no part in this case as a result of their disqualification. Chief Judge (IMA) Krimbill designated himself as Chief Judge in this case, and participated in this case while on active duty.

On 23 August 2013, an officer panel sitting as a general court-martial convicted appellant of thirteen specifications of premeditated murder and thirty-two specifications of attempted murder in violation of Articles 118 and 80, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 880 (2006 & Supp. II 2009) [UCMJ]. The panel sentenced appellant to death, dismissal, and forfeiture of all pay and allowances. The convening authority approved the adjudged sentence. Appellant was represented by military counsel for most of the pretrial proceedings, but appeared pro se during the merits and sentencing portions of the trial. This case is now pending automatic appellate review, pursuant to Article 66, UCMJ.

Appellate defense counsel raise fourteen assigned errors on appeal. We find all claims lack merit and affirm the findings and sentence.[2] Nonetheless, the following seven assigned errors bear discussion: (1) whether the military judge erred in allowing appellant to represent himself; (2) whether the military judge erred in allowing appellant to represent himself at sentencing in a capital case; (3) whether the military judge erred in denying standby counsel's motion for the independent presentation of mitigation evidence; (4) whether the Staff Judge Advocate was disqualified from providing the Article 34, UCMJ, pretrial advice; (5) whether the military judge should have sua sponte excused certain panel members; (6) whether the military judge erred in denying appellant's motions for change of venue due to pretrial publicity and heightened security measures;[3] and (7) whether this court can conduct its review pursuant to Article 66, UCMJ, because appellate defense counsel could not access the entire record of trial.[4]

---

[2] In addition to the above-referenced assigned errors, appellant personally submitted additional matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have given these matters full and fair consideration and find them to be without merit.

[3] Appellate defense counsel present this issue in two separate assigned errors. One assigned error addresses the pretrial publicity, and another assigned error addresses the heightened security measures. We will discuss these issues jointly.

[4] We have given full and fair consideration to appellant's remaining seven assigned errors and find they merit neither discussion nor relief.

## BACKGROUND

Appellant was a Major assigned as a psychiatrist at the Carl R. Darnall Medical Center, Fort Hood. From approximately January to November 2009, appellant searched the internet for various articles relating to the term "*jihad*."[5] On 31 July 2009, appellant went to a gun shop, Guns Galore, in Killeen, Texas, and asked a salesperson for the "most technologically advanced handgun on the market," one with "high magazine capacity." The salesperson suggested the Fabrique Nationale (FN) 5.7 semi-automatic Herstal pistol. Appellant returned to Guns Galore the next day and purchased the recommended pistol.

In October 2009, appellant purchased a year-long membership to a local shooting range where he took a class to qualify for a concealed carry permit and began to conduct target practice on a regular basis. Also in October 2009, appellant's supervisor informed appellant he would deploy with his unit to Afghanistan. Appellant's unit was scheduled to complete pre-deployment SRP on 5 November 2009. Appellant expressed to a co-worker his reluctance to deploy and stated, "They've got another thing coming if they think they are going to deploy me."

At 0630 on 5 November 2009, appellant attended morning prayer at the Killeen Islamic Center. He called for prayer and, at its completion, bid the congregation goodbye stating he was "going home." Approximately seven hours later, appellant went to the SRP complex on Fort Hood where soldiers were undergoing pre-deployment medical review.

Appellant arrived at the SRP carrying a hidden 5.7 millimeter FN Herstal pistol equipped with two laser sights and a fully-loaded 30-round magazine. In addition to the magazine loaded in the pistol, appellant carried fifteen fully-loaded magazines for the FN Herstal, for a total of approximately 400 rounds. Finally, appellant also carried a fully-loaded .357 revolver.

When appellant arrived at the SRP, he went to Station Thirteen with his medical records in hand. He sat in one of the forty-five folding chairs filled with uniformed soldiers. Appellant then arose and told the civilian data-entry clerk, Ms. LW, that the Officer-in-Charge needed to see her about an emergency. As soon Ms. LW left the area, appellant raised the FN Herstal, yelled, "Allahu Akbar!" and

---

[5] The term "*jihad*" has several meanings, including: (1) "a holy war waged on behalf of Islam as a religious duty;" (2) "a personal struggle in devotion to Islam especially involving spiritual discipline;" and (3) "a crusade for a principle or belief." *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/jihad (last visited 25 Nov. 20).

opened fire on the soldiers at Station Thirteen. From that position, appellant was able to cover the only two points of entry and exit to the building.

As soldiers took cover in and around the cubicles, appellant began to move across the facility towards Station Twelve, shooting several soldiers in the back as they tried to run out the front door. Appellant eventually made his way out the door of the SRP facility, pursuing fleeing soldiers. He attempted to enter another building, but the door was locked. Mr. SB, a civilian who was in the vicinity of the SRP site, saw appellant moving outside the SRP building and asked him what was going on. Appellant replied that it was a training exercise and not to worry.

During the chaos, a civilian nurse was able to call 911 from her cell phone. When military police arrived, they located appellant outside the SRP building and a gunfight ensued, lasting approximately ninety seconds. Appellant wounded one police officer. Appellant was eventually shot in the chest and disabled before being taken into custody.

A search of the scene revealed appellant completely emptied four 20-round magazines and two 30-round magazines. Appellant killed thirteen people, including one soldier who was pregnant at the time. He injured thirty-two more. Numerous survivors testified and identified appellant as the shooter.

As a result of being shot, appellant is a paraplegic and permanently confined to a wheelchair. He also suffered some loss of function in his left hand.

## LAW AND DISCUSSION

We will address the seven assigned errors referenced above in the order listed, and provide additional facts as necessary to discuss the claims.

*A. Whether the Military Judge Erred in Allowing Appellant to Represent Himself*

The right to assistance of counsel is a bedrock principle of our nation's constitutional system of justice. "[I]n our adversary system of criminal justice, any person haled into court . . . cannot be assured a fair trial unless counsel is provided to him." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). This principle is equally ingrained in the military justice system, according a court-martial defendant "'ample opportunity to meet the case of the prosecution' to which they are entitled." *Gray v. United States*, 76 M.J. 579, 589 (Army Ct. Crim. App. 2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 685 (1984)) (citing Rule for Courts-Martial [R.C.M.] 506(a)).

From the storied foundation of the right to counsel arises an accused's "correlative right" to dispense with an attorney and proceed pro se. *Faretta v.*

*California*, 422 U.S. 806, 814 (1975) (quoting *Adams v. United States ex rel, McCann*, 317 U.S. 269, 279 (1942)). The Framers of the Constitution "selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation." *Id.* at 832 (1975). Accordingly, the right to proceed pro se is not a "legal formalis[m]," but rather a constitutional right that rests "on considerations that go to the substance of an accused's position before the law . . . ." *Id.* at 815 (quoting *Adams*, 317 U.S. at 279-80). Therefore, "[a]n accused may insist upon representing [himself] – however counterproductive that course may be." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1507 (14 May 2018) (citing *Faretta*, 422 U.S. at 834 (1975)). As the Court further explained in *Faretta*:

> The defendant, and not his lawyer or the [government], will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect to the individual which is the lifeblood of the law."

*Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

As a fundamental component of due process, the right to proceed pro se has long been recognized in military practice. *See United States v. Howell*, 11 U.S.C.M.A. 712, 716-17, 29 C.M.R. 528, 532-34 (1960) (noting the right to counsel under Article 38(b), UCMJ, and the Sixth Amendment correlate to the right of an accused to represent himself). Moreover, the right is of such pivotal constitutional status that it applies equally in all criminal cases, even those where capital punishment is an option. *See Buhl v. Cooksey*, 233 F.3d 783, 806 (3d Cir. 2000) (holding the trial judge erred in denying accused's request to represent himself and such error was a "structural defect" that required automatic reversal of the conviction) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991)). While the right to self-representation is protected by the Constitution, it is a "dangerous course of action for an accused," often so contrary to the fair administration of justice that it is rarely advisable. *United States v. Bowie*, 21 M.J. 453, 456 (C.M.A. 1986).

In recognition of its inherent risks, the right to proceed without counsel is not absolute. An accused may proceed pro se only if he knowingly and intelligently waives his right to appointed counsel. *Faretta*, 422 U.S. at 835. In the military, this requirement is embodied in R.C.M. 506(d), which requires the military judge to make an affirmative finding that the accused is "competent to understand the disadvantages of self-representation" and that his waiver is "voluntarily and

understanding." R.C.M. 506(d); *United States v. Mix,* 35 M.J. 283, 285-85 (C.M.A. 1992); *see also Maynard v. Boone,* 468 F.3d 665, 676-77 (10th Cir. 2006) (holding waiver of counsel contains two distinct inquiries: (1) that the defendant is competent to waive counsel; and (2) that the waiver is knowing and voluntary). Given the risks, "[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be rigorously conveyed." *United States v. Turner,* 644 F.3d 713, 720-21 (8th Cir. 2011) (quoting *Iowa v. Tovar,* 541 U.S. 77, 89 (1993)).

To ensure an accused's decision to proceed pro se is both knowing and intelligent, there must be an adequate inquiry into the accused's mental competency. However, the level of competence necessary to make the decision to waive counsel is no higher than that necessary to waive other constitutional rights. *Godinez v. Moran,* 509 U.S. 389, 398-99 (1993). As such, it is akin to the level of competence necessary to stand trial and cooperate intelligently in one's defense. *Id.* at 398 (rejecting the notion that competence to waive counsel must be measured against a higher standard than competence to stand trial).

Accordingly, where an accused wishes to waive counsel and proceed pro se, there must be "a record sufficient to establish . . . that the defendant 'knows what he is doing and his choice is made with his eyes open.'" *Bowie,* 21 M.J. at 456 (quoting *United States v. Plattner,* 330 F.2d 271, 276 (2d Cir. 1964)). To this end, "[i]t is 'ideal' when the trial judge conducts a 'thorough and comprehensive formal inquiry' including topics such as the nature of the charges, the range of punishment, possible defenses, and a disclosure of risks involved in representing oneself pro se." *United States v. Turner,* 287 F.3d 980, 983 (10th Cir. 2002) (quoting *United States v. Willie,* 941 F.2d 1384, 1388 (10th Cir. 1991)). Ultimately, the military judge must be satisfied, not just that "the accused is mentally competent to make the decision to represent himself," but also that he "clearly understands the disadvantages of self-representation." *United States v. Streater,* 32 M.J. 337, 338-39 (C.A.A.F. 1991). Only when the military judge is satisfied that these findings have been made in sufficient depth and detail should she honor an accused's request to proceed pro se.

In this case, the record establishes that at the time of trial, appellant was forty-two years old. He was born in Arlington, Virginia, and raised entirely in the United States; English is his primary language. Appellant has a medical degree and completed four years of residency in psychiatry. He was a licensed physician who was board certified in general medicine. Appellant also has a Master's Degree in Public Health. He had previously served as an enlisted soldier and spent ten years on active duty as an officer.

Appellant was arraigned on 20 July 2011. At that time, he was represented by a team of military defense counsel consisting of Lieutenant Colonel (LTC) KP, Major (MAJ) CM, and Captain (CPT) JO. Early on during the pretrial proceedings,

appellant released CPT JO, and MAJ JM was detailed in his place. This team represented appellant throughout more than twenty pretrial sessions. However, on 17 May 2013, less than two months before trial was scheduled to commence, appellant submitted a "Waiver of Representation by Counsel and Request to Proceed Pro Se."

Upon receipt of appellant's request, the military judge established appellant had discussed the request with his counsel prior to signing it. She then re-advised appellant of his right to counsel, to include his right to request individual military counsel (IMC) or hire civilian counsel at his own expense. Appellant indicated he understood his right to counsel and still no longer wished to be represented by his three military counsel or any other attorney.[6] The military judge told appellant that if he wanted to represent himself, she would have to determine whether he was "mentally and physically able to do so."

The military judge then explained that she had reviewed the short-form results from a pretrial sanity board conducted pursuant to R.C.M. 706. The military judge noted that the psychiatrists who examined appellant for the sanity board determined he had sufficient mental capacity "to understand the nature of the proceedings, and to conduct or cooperate intelligently in [his] own defense."

The military judge further explained she would also have to evaluate appellant's physical condition.[7] She advised him that representing himself would be much more physically taxing than simply being present and assisting defense counsel as a typical defendant would do. Appellant acknowledged he understood the difference. The military judge discussed how appellant's physical limitations, due to his spinal cord injury, might impact his pro se defense:

> [Y]our defense counsel had earlier told me that perhaps you might not be able to participate here with the defense counsel for more than [five] or so hours a day. If you're going to be representing yourself, I need to determine if that is [five] hours per day . . . . [Y]ou've got to have time at night to prepare your defense for the next day. You've got to be able to remain alert, and be able to comprehend, and be able to strategize for preparation for the next day.

---

[6] The record reflects that, for at least some period of time, appellant contemplated hiring civilian counsel. However, appellant ultimately made it clear to the military judge he was no longer pursuing civilian counsel and intended to represent himself.

[7] The military judge cited *United States v. Cash*, 47 F.3d 1083, 1088-89 (11th Cir. 1995) (citing *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065-67 (11th Cir. 1986)).

Appellant indicated he was confident his physical condition would not limit his ability to conduct his defense. The military judge then explored appellant's current medical care. That exchange revealed that for the year preceding trial, while appellant was in pretrial confinement, either a physician or a supporting nurse visited appellant every couple of days "just to check in." However, according to appellant, these visits typically did not include any examination. Appellant further stated he was not on any "standing medications," other than occasionally taking over-the-counter Tylenol and Naproxen. After learning appellant's last physical examination was over one-year prior to the court session, the military judge ordered the government to have appellant examined by a physician who could provide a report of examination to the court at the next court session.

On 3 June 2013, the court reconvened and the physician, Dr. PL, gave the court a copy of his report on appellant's physical examination. When the report was marked as an appellate exhibit, appellant objected to the military judge considering the report or providing it to the government, because, he argued, it contained "private information, medical information between me and my physician." The military judge overruled appellant's objection and provided a copy of the physical examination report to government counsel.

The military judge then engaged in a lengthy colloquy with appellant, based on the information in the report. She began with appellant's daily schedule and how it was impacted by his physical condition. Appellant indicated that guards woke him at 0430 every day and brought him breakfast. After he ate breakfast, the guards would bring appellant his uniform, which he was able to put on by himself. He also indicated he could transfer himself from his bed to his wheelchair, where he would typically read until leaving for the courthouse. Appellant further stated he had no set time to go to bed and could read in the evenings. Finally, appellant stated that, while he had occasional episodes of fatigue, he did not believe fatigue would affect him during the trial.

The military judge followed this exchange by calling Dr. PL, the physician who conducted appellant's physical examination. Dr. PL testified specifically regarding the impact appellant's physical condition would have on his ability to represent himself. Dr. PL explained that as a paraplegic, appellant had no feeling from the waist down and was unable to perform most motor movements below the waist. The physician explained that appellant is able to sit upright for up to four hours continuously and would then need a break of approximately fifteen minutes to stretch. Dr. PL explained that the stretch breaks were necessary to avoid "spasticity," a condition wherein the muscles of a paraplegic become so tight that they begin to involuntarily spasm. With proper breaks, Dr. PL opined appellant could sit for up to twelve hours per day.

Dr. PL testified he did not believe appellant had any physical limitations that would affect his ability to sustain concentration, his memory, or his ability to understand. The physician stated appellant had access to suppositories and another medication for bloating and flatulence, as well as two anti-fungal medications for his feet but he was not taking those medications. The only medications appellant took were Tylenol and Naproxen. Dr. PL testified that neither of those medications would impact concentration, memory, or understanding. He also testified the level of pain appellant experienced was not likely to impact appellant's concentration. Finally, Dr. PL expressed his concern that appellant would only be able to write three to four pages at a time due to nerve damage impacting his hands.

At the conclusion of Dr. PL's testimony, the military judge questioned appellant about his limited capacity to write and submit documents to the court. Appellant replied, "I'm pretty sure I can do more than that . . . . [I]'m pretty confident that that shouldn't be a problem." Appellant further stated he was able to type on a computer using both hands, despite some difficulty, explaining, "I have a long history of typing so I can compensate because of my experience."

The military judge expressed her concern about appellant's endurance over the course of days that would begin very early in the morning, and how that might affect his ability to prepare for the next day. Appellant indicated he would do his best and did not think the workload would be a problem. Appellant confirmed he still wanted to proceed pro se.

At that time, the military judge began what she identified as a "*Faretta* colloquy."[8] She instructed defense counsel to place a copy of R.C.M. 506(d) in front of appellant and then began a series of questions about appellant's education and background. Appellant admitted that he had no legal training and had never represented himself, not even for a traffic ticket. The military judge next had the lead prosecutor describe his experience on the record so appellant would understand his disadvantage. She then asked appellant to review the charge sheet and explain the charges as he understood them. Appellant indicated he understood he was facing thirteen counts of premeditated murder and thirty-two counts of attempted premeditated murder. He further understood the case was eligible for capital punishment and there was a mandatory minimum sentence of life in prison.

The military judge continued, explaining that she expected appellant to conduct his defense just as if he were a qualified lawyer and that all of the rules of evidence and procedure in the *Manual for Courts-Martial* [*MCM*] would apply to his

---

[8] *See Faretta*, 422 U.S. at 835-36 (emphasizing the need for the trial court to create a record establishing an accused's decision to proceed pro se was made knowingly and intelligently, and that the accused was aware of the disadvantages).

pro se representation. She informed appellant she would revoke his right to proceed pro se if he failed to follow the rules. She explained the process for making evidentiary objections and how such objections preserve issues for appellate review. She also explained the potential adverse consequences to appellate review of his case if he failed to make timely objections. She then used the example of a missed objection for hearsay to demonstrate how appellant's lack of legal knowledge could impact appellate review of his case.

The military judge told appellant he would be better off with trained lawyers who know the law and rules of procedure. She explained that an accused who represents himself will have a difficult time remaining objective, whereas a trained attorney would not carry such a risk. The military judge told appellant it was a bad idea for even legally trained people to represent themselves, noting that if you are not legally trained, "it's even worse." The military judge further explained that appellant's pretrial confinement would make it more difficult for him to review evidence, conduct research, and have access to witnesses for continuing pretrial investigation and preparation. Finally, she explained to appellant that he would not have ready access to any classified evidence, whereas opposing counsel would have such access without any similar impediments.

Throughout the colloquy, appellant consistently indicated he understood the military judge, that he understood the risks and limitations, and that he wanted to proceed with his self-representation. He affirmed his belief that he was physically and mentally capable to review the evidence and prepare for trial, and he stated he was confident he would be ready to proceed to trial. Appellant affirmed his decision was not the result of any threats or force and was made of his own free will. Moreover, appellant expressed a willingness to maintain LTC KP, MAJ CM, and MAJ JM as his standby counsel throughout the trial, so they could assist him with legal research and provide advice as needed or requested.

Following a brief recess, the military judge returned to enter her findings and rule on appellant's request. The military judge reiterated that the R.C.M. 706 sanity board concluded appellant had sufficient mental capacity to understand the nature of the proceeding and to conduct or cooperate intelligently in his defense. Further, she found there was no evidence appellant had any mental capacity issues and that her own observations over five and a half months of pretrial proceedings were that appellant appeared observant, that he comprehended the proceedings, and that he had actively participated in his defense. Accordingly, the military judge found appellant mentally competent to make the decision to waive his right to counsel and to understand the disadvantages of self-representation.

The military judge further found appellant understood his physical limitations and that he was physically able to represent himself with some accommodation. Finally, based on appellant's responses, the military judge found appellant

"[a]ppreciates the nature of a criminal trial and this criminal trial in particular and its significance, and its seriousness, and its possible consequences," and that his decision to represent himself, though unwise, was voluntary and made with full understanding. Therefore, she granted appellant's request to dispense with counsel and represent himself, and directed LTC KP, MAJ CM, and MAJ JM to remain on as standby defense counsel.[9]

Based upon the foregoing, we cannot find any error on the part of the military judge. The military judge conducted a lengthy and detailed colloquy with appellant that was consistent with the relevant R.C.M. and precedential case law. The record reflects appellant's responses are clear and unequivocal, demonstrating he fully understood the requirements and risks of self-representation. Those responses, in combination with the evidence received regarding appellant's mental and physical condition, were more than sufficient to allow the military judge, and this court, to conclude appellant possessed the requisite mental capacity to make the decision to proceed pro se under the standard established by *Farretta*, meaning he was competent to stand trial. *See Godinez*, 509 U.S. at 400-02 (the competence required of a defendant seeking to waive counsel is the competence to waive the right, not the competence to represent oneself).

Accordingly, we find appellant was competent to waive his right to counsel and that he did so knowingly and with full understanding of the meaning and effect of his decision. As such, the military judge did not abuse her discretion in allowing appellant to proceed pro se. *See Indiana v. Edwards*, 554 U.S. 164, 177 (2008) (the trial judge who presided over the competency hearing will often prove best able to

---

[9] The military judge explained the role of standby counsel.

> "Standby counsel will be noticed in all communications
> To and from the court. They will attend all proceedings
> and will be available to [appellant] for consultation and
> advice. Counsel may provide [appellant] with advice and
> procedural instructions. They will not do anything
> without [appellant's] agreement. However, they are
> available to act as [appellant's lawyer] or assist
> [appellant] at any time.

The military judge encouraged appellant to let her know at any time during the trial if he felt he could benefit from advice or if he wanted to take a break to talk to discuss matters with his standby counsel. *See, e.g., McKaskle v. Wiggins*, 465 U.S. 168, 177-78 (1984) (holding trial court has authority to appoint standby counsel to explain court rules and requirements to assure an accused lacking legal knowledge does not interfere with administration of justice).

"make more fine-tuned mental capacity decisions tailored to the individual circumstances of a particular defendant").

Appellate defense counsel, however, argue the military judge's finding that appellant had the mental capacity to make the decision to waive counsel did not go far enough. Citing *Edwards*, counsel argue the military judge was obligated to find not only that appellant was mentally capable of making the decision to waive counsel, but also that he had the mental capacity to represent himself. Contrary to appellate defense counsel's assertions, we find *Edwards* imposes no such requirement.

In *Edwards*, the trial court denied a pro se request because it found the defendant had not only a history of schizophrenia, but also that he was suffering from schizophrenia at the time of trial. 554 U.S. at 167-69. The Supreme Court held that a trial judge, by ruling, or a state, by law, may limit an accused's request to proceed pro se if the court finds the accused lacks the mental capacity to represent himself. *Id.* at 174. The Court in *Edwards* was clear it was addressing only a limited category of cases where an accused, while competent to waive counsel under the standard established in *Godinez*, still lacked the capacity, due to a mental disease or defect, to actually conduct his own defense. *Id.* at 172-73; *see also United States v. Fields*, 761 F.3d 443, 467-68 (5th Cir. 2014) ("*Edwards*' 'new rule applies only in the exceptional situation where a defendant is found competent to stand trial and elects to appear pro se, but is so severely mentally ill that his self-representation threatens an improper conviction or sentence.'") (quoting *Panetti v. Stephens*, 727 F.3d 398, 414 (5th Cir. 2013)), petition for cert. filed (27 January 2014) (No. 13-8453) (cert. denied, 525 U.S. 848 (1998)). The Court held that in such cases, the Constitution permits judges to ask whether a particular defendant is mentally competent to conduct his own defense and likewise permits states to require an accused who represents himself be mentally competent to conduct his defense. *Edwards*, 554 U.S. at 177-78.

Numerous jurisdictions have subsequently found the Court's holding in *Edwards* is permissive, allowing the trial court the discretion to conduct such an inquiry, rather than requiring any additional competence inquiry beyond that in *Godinez*. *United States v. Siddiqui*, 699 F.3d 690, 705 (2d Cir. 2012) ("*[E]dwards* holds a court *may* require that [defense counsel] appear on behalf of a mentally ill defendant, not that it *must* do so") (emphasis added).[10] We likewise find no such requirement exists in the R.C.M., nor in the holdings of any the military courts.

---

[10] *See also United States v. Bernard*, 708 F.3d 583, 585 (4th Cir. 2013) (Noting *Edwards* addressed only whether the Constitution permits courts to *force* counsel on a mentally ill defendant who is competent to stand trial); *Panetti*, 727 F.3d at 414

(continued . . .)

Moreover, given the wealth of contrary precedent, we decline to impose such a requirement here. As such, we hold the military judge's determination that appellant was mentally competent to waive the right to counsel was all that was required. The military judge's decision to allow appellant to proceed pro se was not an abuse of discretion.[11]

We further find nothing occurred during trial which should have caused the military judge to reconsider her decision. *See, e.g., Turner*, 644 F.3d at 724-25 (citing *United States v. Ghane*, 490 F.3d 1036, 1041 (8th Cir. 2007)) (holding even when a defendant is competent at the beginning of trial, the court must remain alert during trial to indications the defendant is no longer competent). Appellate defense counsel argue appellant's initial pursuit of a defense that was not cognizable demonstrates appellant's lack of fitness to represent himself. *See United States v. Fraizer-El*, 204 F.3d 553 (4th Cir. 2000). However, the record reveals that while appellant initially sought to pursue a defense of others defense, he ultimately honored the judge's ruling denying him the ability to pursue that defense.

Additionally, appellate defense counsel point to appellant's questioning of his former supervisor as an indication appellant lacked mental fitness. Specifically, appellant asked his supervisor about appellant's officer evaluation report (OER), which was objectively favorable. We find appellant's cross-examination here was

---

(. . . continued)
(holding *Edwards* allows states to insist on counsel for accused not competent to conduct his own defense, but does not require it); *Tatum v. Foster*, 847 F.3d 459, 465-66 (7th Cir. 2017) (holding state may insist on counsel where defendant is competent to stand trial but not competent to represent himself); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009); *Turner*, 644 F.3d at 724; *United States v. DeShazar*, 554 F3.d 1281, 1290 (10th Cir. 2009) (*Edwards* holds only that a court may require counsel on behalf of a mentally ill defendant, not that they must).

[11] Even if the *Edwards* standard were applicable, we would find no error in the military judge allowing appellant to conduct his own defense. At the time appellant's pro se request was granted, there was nothing in the record to indicate appellant in any way lacked the mental capacity to conduct his own defense. Appellant was an Army officer with several advanced degrees. Further, the pretrial sanity board explicitly concluded appellant did not suffer from any serious mental disease or defect and that he possessed the requisite capacity to participate in and conduct his own defense. Additionally, the military judge had the benefit of five months of pretrial interactions with appellant. This gave the military judge the perspective to properly determine he was mentally competent to conduct his own defense. *See Edwards*, 554 U.S. at 177-78. If contrary evidence existed at that time, it was not presented to the military judge.

actually helpful for his defense, because it demonstrated he performed his duties well.

Appellant also asked his supervisor whether appellant had ever raised concerns about United States soldiers committing atrocities in Iraq or Afghanistan. The government objected to the latter question and appellant countered that it was relevant to demonstrate appellant's motive. The military judge sustained the objection and appellant dropped any further inquiry. We note appellant's question here was arguably a permissible attempt to demonstrate a less callous nuance to his motivations, in opposition to the government's narrative, which portrayed appellant as a religiously motivated terrorist. Rather than showing appellant was mentally unfit, we find the cross-examination in question demonstrates appellant was engaged in the proceedings, that he understood his responsibility to establish the grounds for admissibility of testimony and evidence, and finally, that he respected the rules of procedure when the military judge sustained an objection.

While appellant's defense was anything but robust in comparison to the defense an experienced trial litigator might have presented, he nonetheless interacted regularly and effectively with the military judge over the course of several weeks of trial. He was polite and respectful of the rules of court. *See Turner*, 644 F.3d at 726 (noting pro se accused's demeanor was polite and respectful at all times and used cross-examination to his benefit). Appellant's responses to the military judge, and the questions he asked reflected he was paying attention and understood what was occurring in the proceedings at the time. On numerous occasions, the military judge directed appellant to consult with standby counsel, which appellant did. On other occasions, appellant, on his own volition, sought leave of the court to consult with standby counsel, which the military judge granted liberally.

Finally, neither appellant himself, appellant's standby counsel, nor counsel for the government, raised any concern about appellant's mental fitness during the merits portion of the trial.[12] Accordingly, we find the military judge, who was in the best position to observe, did not err in allowing appellant to continue pro se. *See United States v. Washington*, 596 F.3d 926, 941 (8th Cir. 2010) (affording deference to the judge who observed and interacted with an accused throughout the proceedings).

---

[12] On 12 June 2013, standby counsel sought to withdraw, however, that request was not based upon concerns of appellant's mental capacity. Additionally, shortly after the trial on the merits began, standby counsel moved the military judge to modify their role, due to their belief that appellant's goal was imposition of the death penalty. Standby counsel argued that even as standby counsel, they could not ethically assist appellant towards that end. The military judge denied their request to withdraw and the request to modify their role.

*B. Whether the Military Judge Erred in Allowing Appellant to Represent Himself at Sentencing in a Capital Case*

In a related assigned error, appellate defense counsel allege the military judge erred by allowing appellant to represent himself during the sentencing phase of his trial. We find this contention to be without merit.

Between the time the panel began deliberating on findings until the government rested its sentencing case, the military judge conducted several pre-sentencing Article 39(a), UCMJ, sessions, during which she expressly addressed both appellant's decision to continue to represent himself and his right to present evidence in mitigation and extenuation during the sentencing phase of the trial. As to sentencing, the military judge explained appellant's right to present evidence in mitigation and extenuation related to any offenses for which he was found guilty. She further explained his right to make either a sworn or unsworn statement, and explained how unsworn statements may be challenged. Appellant repeatedly affirmed he understood his rights during the sentencing phase of his trial.

In addition to covering appellant's right to present sentencing evidence, the military judge, on three separate occasions, confirmed appellant's desire to continue to represent himself during sentencing proceedings. In doing so, the military judge again explained the importance and complexity of sentencing in a capital case. She reminded appellant that his standby counsel were much better equipped than he was to litigate the sentencing phase of his trial. The military judge also inquired about appellant's physical condition and he assured her he was physically capable of proceeding. Finally, the military judge stressed that she felt it was a bad idea for appellant to continue to represent himself.

Nevertheless, appellant affirmed that he wanted to continue to represent himself and that he understood that by doing so, he would be unable to later claim his representation was ineffective. The military judge again found appellant was competent to make the decision to proceed pro se and to understand the disadvantages of self-representation.

Appellant's decision to proceed pro se during sentencing proceedings prompted standby counsel to file a motion seeking independent presentation of mitigation evidence.[13] The military judge allowed standby counsel to file a written motion and make arguments in support of the motion. However, appellant opposed the motion and declined to waive attorney-client privilege with regard to a number of exhibits standby counsel sought to admit. Ultimately, as discussed below, the

---

[13] We discuss the military judge's denial of standby counsels' motion to present independent presentation of mitigation evidence below.

military judge denied standby counsel's motion to present independent mitigation evidence. Ruling orally on the record, the military judge held the core of appellant's right to self-representation was the right to control the direction of his case, which "cannot be impinged upon merely because society, or a judge, or a standby counsel may have a difference of opinion . . . as to what type of evidence, if any, should be presented in the penalty stage of trial."

Following the government's case, appellant elected not to present any evidence in mitigation and extenuation or to make any statement on his own behalf. Based on the earlier motion filed by standby counsel, the military judge had a list of mitigation evidence available to appellant, as well the names of some witnesses whom he might call. Using that list, the military judge questioned appellant on each witness and piece of potential mitigation evidence to ensure he understood what was available, and to confirm he knowingly intended to waive presentation of that evidence. In each instance, appellant explicitly waived his right to present the evidence in question.

During the sentencing phase, the government called nineteen witnesses to testify in person and offered one stipulation of expected testimony. The witnesses included three survivors of appellant's attack. These witnesses testified about such matters as the extent of their injuries and the lasting mental and physical disabilities they faced. The remaining witnesses were family members and associates of those who were killed by appellant. These witnesses testified about the trauma of learning of the death of their loved ones, as well as their own on-going experiences with grief and loss. Finally, the government also admitted a number of photographs of those who lost their lives and the family members they left behind. When coupled with the testimony and evidence admitted during the merits, the government's sentencing case was understandably emotional and objectively aggravating.

Although appellant did not present any sentencing evidence, the military judge instructed the panel on several factors in mitigation that they should consider. These included appellant's age, record of service as reflected in appellant's Officer Record Brief and in one OER admitted by appellant on the merits, appellant's awards and medals, and his civilian education. Appellant did not object to these instructions. At appellant's request, the military judge instructed on his physical impairment and confinement to a wheelchair, his demeanor during trial, the duration of his pretrial confinement, and finally, on his lack of prior convictions and non-judicial punishment.

Appellate defense counsel now argue it was error for the military judge to allow appellant to represent himself at sentencing in a capital case, because appellant ultimately did nothing during this critical phase of his capital trial. However, appellate defense counsel provide no legal basis upon which this court could find error.

In *Furman v. Georgia*, the Supreme Court struck down the death penalty, in large part out of concern it was too often applied in an arbitrary and capricious manner which violated the Eighth Amendment's protection against cruel and unusual punishment. 408 U.S. 238, 239-40 (1972). Four years later, the Court again addressed the issue of the death penalty, this time holding that a carefully tailored statutory sentencing structure, one that gives adequate guidance to the sentencing authority to distinguish those accused truly worthy of death, could withstand constitutional scrutiny. *Gregg v. Georgia*, 428 U.S. 153, 195 (1976).

From that point, those jurisdictions with capital punishment have developed capital sentencing structures that typically bifurcate the proceedings between a guilt phase and a sentencing phase in which the sentencing authority must weigh evidence in aggravation against evidence in mitigation. *See Proffitt v. Florida*, 428 U.S. 242, 259 (1976); *Jurek v. Texas*, 428 U.S. 262, 271-76 (1976).[14] Generally speaking, the sentencing authority in a capital jurisdiction cannot vote for death without finding that the matters in aggravation outweigh those in mitigation to some evidentiary standard. *See Proffitt*, 428 U.S. at 252-53 (noting Florida's capital sentencing procedures require the Supreme Court of Florida to reweigh the aggravating and mitigating circumstances). The military capital-sentencing paradigm is similarly structured. *See* R.C.M. 1004; *United States v. Simoy*, 50 M.J. 1, 2 (C.A.A.F. 1998); *United States v. Loving*, 41 M.J. 213 (C.A.A.F. 1994); *United States v. Curtis*, 32 M.J. 252, 263 (C.M.A. 1991).

Under this structure, the sentencing portion of a trial is often the most significant gateway through which a valid death sentence must pass. Accordingly, it is no surprise that the performance of counsel during sentencing, as reflected in the caliber of mitigation evidence identified and introduced, is common grounds for appellate attack on death sentences. *See Wiggins v. Smith*, 539 U.S. 510, 522 (explaining "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). This is true of military capital cases, as well. *See United States v. Akbar,* 74 M.J. 364, 385-91 (C.A.A.F. 2015); *Loving v. United States*, 64 M.J. 132 (C.A.A.F. 2006).

---

[14] *See also Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (vacating death sentence because there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not"); *Lockett v. Ohio*, 438 U.S. 586, 608-09 (1978) (holding Ohio death penalty statute unconstitutional because it limited the range of circumstances to be considered in mitigation); *Coker v. Georgia*, 433 U.S. 584, 593 (1977) (invalidating Georgia statute providing a discretionary capital sentence for rape of an adult woman).

In light of the forgoing, we are keenly aware of the critical importance of mitigation evidence in a capital case. Nonetheless, appellant elected to proceed pro se, and as we held above, the military judge did not err in finding he was competent to make that decision. Neither Congress nor the President have chosen to enact any rule or procedure that would abrogate appellant's choice during sentencing, in capital cases or otherwise. Appellate defense counsel point to three state jurisdictions that have, either statutorily or by judicial decision, compelled the presentation of mitigation evidence in capital cases where the accused proceeds without counsel.[15] However, to the extent those cases support appellant's argument, they were not binding upon the military judge and thus created no obligation for her to act, and similarly do not bind this court.

We are unaware of any military or federal cases that required the military judge to bifurcate appellant's right to self-representation between the findings and sentencing phases. Therefore, we determine that the fundamental constitutional status of the right to self-representation must take precedence over the requirements of the UCMJ's capital sentencing scheme. We agree with the military judge that it is not the role of this court to impinge upon appellant's right to proceed pro se, even when his decisions might run contrary to the standard of representation the law would demand of competent and zealous counsel.

Accordingly, we find the military judge did not err in allowing appellant to represent himself during the sentencing phase of his court-martial. We further find that the aggravating factor and the aggravation evidence presented by the government substantially outweighed the mitigation evidence presented by appellant. Therefore, appellant's sentence of death was authorized in accordance with R.C.M. 1004(b)(4)(C).[16]

---

[15] *See* N.C.G.S. § 15A-2000(b) (North Carolina statute requiring the presentation of mitigating circumstances to jury in capital sentencing proceedings); *Marquadt v. State*, 156 So.3d 464, 490 (Fla. 2015) (holding trial courts are required to consider mitigation evidence during penalty phase of trial even when accused waives the presentation of mitigation); *Billings v. Polk*, 441 F.3d 238, 252 (4th Cir. 2006) (North Carolina law requires submission of mitigating circumstances to the jury, even over objection by an accused); *State v. Reddish*, 859 A.2d 1173, 1203-04 (N.J. 2004)(noting a pro se defendant's failure to present mitigating evidence has constitutional ramifications which may necessitate participation by standby counsel).

[16] We specifically and comprehensively considered whether appellant's sentence is appropriate for the crimes of conviction and whether appellant's sentence is generally proportional to those imposed by other jurisdictions under similar circumstances. We considered military cases, federal district court cases, and

(continued . . .)

*C. Whether the Military Judge Erred in Denying Standby Counsel's Motion for the Independent Presentation of Mitigation Evidence*

Related to appellate defense counsels' claims the military judge erred by allowing appellant to represent himself, appellate defense counsel further argue the military judge erred by denying standby counsels' motion to present independent mitigation evidence over appellant's objection. Appellate defense counsel frame the issue as a decision to exclude evidence, which they assert we should review for an abuse of discretion. However, we find the military judge's refusal to allow presentation of mitigation evidence over appellant's objection is a question of law, which we review de novo. *See, e.g., United States v. Davis*, 180 F.3d 378 (5th Cir. 2002). As explained below, we find no error.

As noted above, prior to the sentencing phase of appellant's court-martial, the military judge engaged in another *Faretta* inquiry with appellant. The military judge again properly determined appellant was competent to waive his right to counsel and proceed pro se into the penalty phase of his trial. At that point, the military judge permitted standby counsel to argue a motion to independently present mitigation evidence. After reviewing standby counsels' brief and hearing arguments, the military judge engaged in a more specific colloquy with appellant, in which appellant objected to the presentation of any such evidence by standby counsel. During the exchange with the military judge, appellant requested a recess to confer with standby counsel on the matter. After conferring with counsel, appellant affirmed his objection to the submission of any mitigation evidence by standby counsel. The military judge denied standby counsel's motion, placed her reasoning on the record, and ultimately placed the transcript of the proceeding and the related exhibits under seal.

As standby counsel did at trial, appellate defense counsel now rely on the example of three states to support their argument for independent presentation of mitigation evidence. Those states, North Carolina, New Jersey, and Florida, each have statutory capital sentencing schemes that either explicitly, or through judicial interpretation, require the admission of mitigation evidence in a capital trial, even

---

(. . . continued)

Supreme Court decisions on state cases involving circumstances similar to appellant's crimes. We find appellant's capital sentence was both appropriate and proportional for appellant's convictions. *See Akbar*, 74 M.J. at 408 (emphasizing the preference for the Court of Criminal Appeals to include an explicit discussion of its proportionality review) (citing *United States v. Gray*, 51 M.J. 1, 63 (C.A.A.F. 1999); *United States v. Curtis*, 33 M.J. 101, 109 (C.M.A. 1991)).

over the accused's objection.[17] Appellate defense counsel argue the military judge was obliged to follow the example of those states and direct the independent presentation of mitigation evidence over appellant's objection to ensure the constitutional validity of his death sentence. We disagree.

Rule for Courts-Martial 1004(b)(3) affords a capital accused "broad latitude" to present evidence in mitigation and extenuation. The rule reflects the effort of the President, Congress, and the drafters of the R.C.M. to narrow the scope of those eligible for the death penalty by ensuring the panel considers admissible mitigating evidence and finds it is substantially outweighed by any evidence in aggravation. *See Loving v. United States*, 517 U.S. 748, at 754-755 (1996). We recognize the weighing of mitigating evidence against evidence in aggravation is critical to the constitutionality of the UCMJ's capital sentencing scheme. However, neither R.C.M. 1004, nor any other provision of the UCMJ or the R.C.M., make presentation of mitigation evidence obligatory when a pro se accused objects. Likewise, there is no military case law interpreting the UCMJ's capital sentencing scheme as requiring standby counsel to present mitigation evidence over a pro se accused's objection.

The capital sentencing schemes in the three states relied upon by appellate defense counsel are merely suggestive to this court, and we do not find their logic compelling. In our view, forcing the independent presentation of mitigation evidence over a pro se accused's objection undermines the right to self-representation as defined by the Supreme Court in *Faretta*, 422 U.S. 806. Following *Faretta*, the Supreme Court addressed the limits of a standby counsel's role in assisting a pro se accused in *Wiggins*, 465 U.S. 168. In *Wiggins*, the Court held the core of *Faretta* is the pro se defendant's right to "preserve actual control over the case he chooses to present to the jury." The Court further held that allowing standby counsel to present evidence to the jury over a pro se accused's objection undercuts a key tenant of *Faretta* by "[destroying] the jury's perception that the defendant is representing himself." *Id*. at 178.

The Fifth Circuit has specifically addressed the appointment of independent counsel to present mitigation evidence in a federal death penalty trial. *See Davis*, 180 F.3d 378. In *Davis*, the court reviewed a trial court's decision, during a capital sentence rehearing, to appoint independent counsel to present mitigation evidence when the accused declined to do so. *Id*. at 380. The court reiterated the Supreme Court's holding in *Wiggins,* recognizing the core of the "*Faretta* right" is the accused's right to preserve control over the direction of his case, and noting this right should be preserved "[r]egardless of whether society would benefit from having a different presentation of the evidence." *Id*. at 385 (citing *Wiggins*, 465 U.S. at 178). As such, the Fifth Circuit enjoined independent counsel from

---

[17] *See* footnote 15, *supra*.

presenting any mitigation evidence over the accused's objection. *Id.*[18] We agree with the Fifth Circuit that permitting independent presentation of mitigation evidence, over an accused's objection, would "stri[p] [an accused] of his right to preserve actual control" over his sentencing case. *Id.*

Accordingly, we find that allowing standby counsel's presentation of mitigation evidence over appellant's objection would have violated his right to self-representation under the Sixth Amendment. The military judge, therefore, correctly denied standby counsel's motion. We find appellant was given full opportunity to present evidence in mitigation pursuant to R.C.M. 1004(b)(3) and 1004(b)(4)(C), and the panel considered all appropriate evidence of record in the penalty phase. *See Eddings v. Oklahoma*, 455 U.S. 104, 128 (1982). Thus, we find no error.

### D. *Whether the Staff Judge Advocate Was Disqualified from Providing the Article 34, UCMJ, Pretrial Advice*

We next turn to appellant's claim the Staff Judge Advocate (SJA) was disqualified from providing the Article 34, UCMJ, pretrial advice in appellant's case. Appellant claims the SJA was disqualified because he (1) "was part of a community profoundly affected by the tragedy;" (2) supervised and mentored soldiers who had been caught in the attack; and (3) visited the crime scene.[19] Appellate defense counsel request this court commute appellant's sentence or order a rehearing. As we explain below, we do not find the SJA's status as a member of the Fort Hood community, nor any of his actions taken in the course of his official duties, disqualified him from acting as the SJA in appellant's case. Further, even if we were to assume the SJA was disqualified, we find appellant suffered no prejudice.

---

[18] *See also Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (Constitution does not prevent competent capital accused from waiving presentation of mitigation evidence); *Singleton v. Lockhart*, 962 F.2d 1315, 1322-23 (8th Cir. 1992) (an accused may be found competent to waive the presentation of mitigation evidence); *Barnes v. Sec'y, Dep't of Corr.*, 888 F.3d 1148, 1160 (11th Cir. 2018) (distinguishing Fifth Circuit's decision in *Davis*, 285 F.3d 378, from Florida Supreme Court's interpretation of *Farretta*).

[19] In support of this assertion, appellant submitted a motion to attach a post-trial declaration made by CPT NF, a former judge advocate, dated 21 May 2018. Captain NF's declaration recounts his actions at the scene of appellant's crime on 5 November of 2009, as well as his interactions with the SJA in the days following appellant's attack. Although the affidavit contains hearsay and is otherwise outside the record of trial, we nonetheless consider it for purposes of this assigned error.

Whether an individual is disqualified from acting as the SJA responsible for advising the convening authority is a question of law we review de novo. *United States v. Stefan*, 69 M.J. 256, 258 (C.A.A.F. 2010) (citing *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004)). Article 34, UCMJ, requires that "[b]efore directing the trial of any charge by general court-martial, the convening authority shall refer it to his staff judge advocate for consideration and advice." *MCM* (2012). Article 34, UCMJ, prohibits the convening authority from referring a specification under a charge unless the SJA has advised in writing of the following: "(1) the specification alleges an offense under [the UCMJ]; (2) the specification is warranted by the evidence indicated in the [Article 32 report of investigation]; and (3) a court-martial would have jurisdiction over the accused and the offense." *Id.* The SJA must provide the convening authority a written and signed statement expressing his conclusion as to each of the aforementioned matters and recommend the action to be taken by the convening authority. *Id.*

Rule for Courts-Martial 406 sets forth the same requirements as Article 34, UCMJ. *MCM* (2012). Additionally, the Discussion accompanying R.C.M. 406 states the following:

> The [SJA] is personally responsible for the pretrial advice and must make an independent and informed appraisal of the charges and evidence in order to render the advice. Another person may prepare the advice, but the staff judge advocate is, unless disqualified, responsible for it and must sign it personally. Grounds for disqualification in a case include previous action in that case as investigating officer, military judge, trial counsel, defense counsel, or member.

R.C.M. 406 Discussion. Similarly, Article 6(c), UCMJ, provides that "[n]o person who has acted as a member, military judge, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in any case may later act as [an SJA] or legal officer to any reviewing authority upon the same case."

In appellant's case, the SJA performed none of the disqualifying roles listed in either Article 6(c) or R.C.M. 406. Nonetheless, appellate defense counsel contend the SJA "functions in a quasi-judicial role when providing pretrial advice under Article 34," and thus should be held to standards similar to those applied to a military judge. To support this assertion, appellate defense counsel argue the SJA's role in providing pretrial advice has evolved from being "purely advisory" to "more like a quasi-judicial magistrate making a probable cause determination that protects the accused from being prosecuted on baseless charges." *United States v. Hayes*, 24 M.J. 786, 790 (A.C.M.R. 1987).

Relying on *United States v. Reynolds*, 24 M.J. 261 (C.M.A. 1987), which addresses the impartiality of Article 32 investigating officers (IO), appellate defense counsel argue the SJA should be held to a similar quasi-judicial standard of impartiality. *Id.* at 263 (noting "[t]he appointed Article 32 officer must be impartial and, as a quasi-judicial officer, is held to similar standards set for a military judge"). According to appellant, the same objective test for determining the disqualification of a judge should apply to the SJA. Under that standard, a judge is disqualified if "a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (quotations omitted). We disagree that *Reynolds* is applicable to the actions of the SJA in appellant's case.

In *Reynolds*, the appellant challenged the Article 32 IO's impartiality because the IO worked in the Legal Assistance Division of the SJA's office. *Id.* at 263. The court held there was no appearance of impropriety because the IO had limited contact with the trial counsel and never discussed the case with the trial counsel. The holding in *Reynolds* is limited to Article 32 IO's and nothing in *Reynolds*, nor any subsequent case, supports the assertion that the SJA, in providing pretrial advice, must be held to the same standard of impartiality as a military judge.

Although we decline to treat the role of the SJA as quasi-judicial, that does not end our inquiry. We must consider the objectivity of the SJA's actions in this case, in light of Article 6(c), UCMJ. An SJA who advises a convening authority on the disposition of charges must "be, and appear to be, objective." *United States v. Dresen*, 47 M.J. 122, 124 (C.A.A.F. 1997) (citations omitted). In the context of an SJA's post-trial actions, Article 6(c) has been "[b]roadly applied . . . [i]n light of its well-established purpose 'to assure the accused a thoroughly fair and impartial review.'" *United States v. Lynch*, 39 M.J. 223, 227-28 (C.M.A. 1994) (quoting *United States v. Crunk*, 4 U.S.C.M.A. 290, 15 C.M.R. 290, 293 (1954) (holding SJA disqualified because he had previously acted as the trial judge)). "Other conduct by [an SJA] may be so antithetical to the integrity of the military justice system as to disqualify him from participation." *United States v. Engle*, 1 M.J. 387, 389 (C.M.A. 1976) (finding SJA disqualified from post-trial review where accused claimed the same SJA provided defective Article 34 advice). Accordingly, we believe it is appropriate for this court to determine whether a reasonable person could impute to the SJA a personal interest or feeling in the outcome of the case. *See, e.g., United States v. Jeter*, 35 M.J. 442 (C.M.A. 1992); *see also United States v. Crossley*, 10 M.J. 376 (C.M.A. 1981); *United States v. Gordon*, 2 C.M.R. 161 (1952).

According to CPT NF's declaration, he was present at the SRP on 5 November 2009 during the attack. That same day, CPT NF met with the SJA and told the SJA what he witnessed. Several days later, the SJA mentioned to CPT NF that he had toured the SRP building the evening of 5 November. According to CPT NF, the SJA stated, "[i]t was a difficult experience that would make it hard to sleep at night or

23

words to that effect." Based on the information in CPT NF's declaration, appellate defense counsel implore this court to find a reasonable member of the public would harbor doubts about the SJA's impartiality in this case.

Appellate defense counsel contend appellant's case is analogous to *Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995), which involved the trials of Timothy McVeigh and Terry Nichols, who bombed the Alfred P. Murrah Building in Oklahoma City. *Id.* at 350-51. In *Nichols*, the Tenth Circuit held the trial judge was not impartial because his courtroom and chambers were damaged in the bombing and a member of his staff was injured, as were other court personnel. *Id.* at 349-50. However, as the court noted in *Nichols*, determining whether a judge should be disqualified is an extremely fact driven analysis, and each case "[m]ust be judged on [its] unique facts and circumstances more than by comparison to situations in prior jurisprudence." *Id.* at 351 (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)).

Under the specific facts of appellant's case, we find neither the SJA's statement to CPT NF, nor the SJA's membership in the Fort Hood community, call into question his impartiality. First, the SJA's physical office was not involved in the attack. Fort Hood is a large installation. An attack at the SRP site, located separate and apart from the SJA's office, is not equivalent to an explosion that damaged a judge's chambers. Second, unlike the staff member who was injured in *Nichols*, while CPT NF was present at the SRP site, he was not physically injured during the attack. Third, no other member of the SJA's office was injured or present for the attack. Finally, as the court pointed out in *Nichols*, "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" are not ordinarily sufficient to require disqualification. 71 F.3d at 351.

We find the SJA's purported statement to CPT NF following the SJA's tour of the SRP building does not show the SJA's partiality, but rather was an expression of empathy. Moreover, his role as SJA under R.C.M. 406 required him to review and comment on the evidence gathered in the pretrial investigation pursuant to Article 32, UCMJ. That evidence was likely disturbing to him as well. Nonetheless, we have no reason to doubt the SJA's ability to view it dispassionately and make a fair and impartial recommendation as to the disposition of charges. Finally, appellant points to nothing in the pretrial advice itself that in any way suggests the SJA was partial. Accordingly, we find the SJA had only an official interest in preparing the pretrial advice.

Finally, even if the SJA should have been disqualified, we find appellant suffered no prejudice as a result of the SJA's pretrial advice. *See United States v. Loving*, 41 M.J. at 288 (C.A.A.F. 1994) (citing *United States v. Murray*, 25 M.J. 445, 447 (C.M.A. 1988)) (noting defects in the pretrial advice are not jurisdictional, but are tested for prejudice). Here, the SJA provided the General Court-Martial Convening Authority (GCMCA) an objective and informed written recommendation (SJAR), pursuant to Article 34, UCMJ, regarding the disposition of the preferred

charges. Specifically, the SJAR noted the convening authority met previously with appellant's trial defense counsel. During the meeting, the defense team provided an oral presentation and written submissions in support of its request for a non-capital referral. The SJAR clearly advised the GCMCA he was "[n]ot required to take any specific action or to dispose of the charges in any particular manner. Any action taken by you is to be made within your sole, independent discretion as a [GCMCA]."

Further, the SJA's advice was based on an informed and impartial review of the evidence. The SJA stated in his recommendation that he considered the Charge and its Specifications, the Additional Charge and its Specifications, the R.C.M. 706 sanity board results, the Report of Investigation, the verbatim transcript from the Article 32 investigation (which was presided over by a senior Military Judge who was learned in the practice of capital litigation), the transmittal documents from the chain of command, and the defense team's written submissions. As required by Article 34, the SJA provided the following legal conclusions: (1) Each specification alleges an offense under the UCMJ; (2) The allegation of each offense is warranted by the evidence in the Report of Investigation; and (3) The court-martial will have jurisdiction over the accused and the alleged offenses.

The SJA recommended the convening authority direct the case to be tried as capital, due to the presence of an aggravating factor under R.C.M. 1004(c)(7)(J) (providing death may be adjudged only if an aggravating factor is found such as, if "[t]he accused has been found guilty in the same case of another violation of Article 118"). The SJA was not alone in that recommendation. The SJA's advice noted that appellant's chain-of-command and the Article 32 IO also recommended a capital referral. Finally, further underscoring the SJA's impartiality, the SJAR provided an alternative option for the convening authority to direct the case to be tried as non-capital.

Based upon the foregoing, we hold the SJA was not disqualified from providing pretrial advice in appellant's case to the convening authority. Even assuming arguendo the SJA was disqualified, we find no prejudice to appellant.

### E. Whether the Military Judge Should Have Sua Sponte Excused Certain Panel Members

Appellate defense counsel claim the military judge should have sua sponte excused two panel members for bias. Appellate defense counsel assert Colonel (COL) DM's presence in the Pentagon on September 11, 2001, creates a perception of implied bias. Appellate defense counsel also assert LTC KG was actually biased because he had a bumper sticker on his truck that read, "Major League Infidel." Although appellant, proceeding pro se at this point, conducted individual voir dire of both panel members, ultimately neither he nor the government challenged either of them.

"An accused 'has a constitutional right, as well as a regulatory right, to a fair and impartial panel.'" *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004) (quoting *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001)). Rule for Courts-Martial 912(f)(1) lists the grounds available for challenging potential panel members. Subparagraph (N) of that section provides a general ground for challenge when a member should not sit in the interest of having a court-martial free from substantial doubt as to legality, fairness, and impartiality.[20] *See United States v. Minyard*, 46 M.J. 229, 231 (C.A.A.F. 1997). This general ground includes both actual and implied bias. *See United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999) (citing *United States v. Rome*, 47 M.J. 467, 469 (C.M.A. 1998)). Counsel for each side make challenges for cause based on either actual or implied bias, and the military judge then rules on those challenges. *See* UCMJ art. 41(a)(1); R.C.M. 912(d), (f)(3). The burden of persuasion for challenges rests with the party making the challenge. *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002) (citing R.C.M. 912(f)(3)); *Warden*, 51 M.J. at 81 (citing *Rome*, 47 M.J. at 469).

The test for actual bias is whether any bias held by a member is such that it will not yield to the evidence presented and the instructions of the military judge. *Warden*, 51 M.J. at 81 (citing *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997)) (quoting *United States v. Reynolds*, 23 M.J. 292, 294 (C.M.A. 1987)). Actual bias is both a question of fact and a question of credibility, wherein a set of facts suggests some grounds for bias that the member either explains or renounces through voir dire. *See United States v. Napolitano*, 53 M.J. 162, 166 (C.A.A.F. 2000) (citing *Warden*, 51 M.J. at 81 (C.A.A.F. 1999)); *see also United States v. Daulton*, 45 M.J. 212, 217 (C.A.A.F. 1997) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). We afford the military judge great deference when deciding whether actual bias exists because of her superior position to observe the members and assess their credibility. *See Napolitano*, 53 M.J. at 166; *Warden*, 51 M.J. at 81; *Minyard*, 46 M.J. at 231.

Implied bias, on the other hand, asks whether, regardless of any disclaimer, "most people in the same position as the member would be prejudiced [i.e. biased]." *Strand*, 59 M.J. at 459 (quoting *Napolitano*, 53 M.J. at 167); *see also United States v. Armstrong*, 54 M.J. 51, 53 (C.A.A.F. 2000) (citing *Warden*, 51 M.J. at 81-82). We consider implied bias under a totality of the circumstances. *Strand*, 59 M.J. at 459. However, we afford less deference to the military judge when deciding whether implied bias exists, because "[i]mplied bias is viewed through the eyes of the public, focusing on the appearance of fairness." *Id.* at 458 (quoting *Rome*, 47 M.J. at 469).

---

[20] Rule for Courts-Martial 912(f)(1)(N) requires a member be excused for cause "[w]henever it appears that the member 'should not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality.'"

Accordingly, a military judge's assessment of bias is not dispositive. *Minyard*, 46 M.J. at 231 (citing *Daulton*, 45 M.J. at 218).

If neither party exercises a challenge for cause, then with limited exceptions, the challenge is considered waived. *See* R.C.M. 912(f)(4); *see also* R.C.M. 912(g)(2). However, "[n]otwithstanding the absence of a challenge or waiver of a challenge by the parties, the military judge may, in the interest of justice, excuse a member against whom a challenge for cause would lie." R.C.M. 912(f)(4). This power of the military judge to sua sponte exercise a challenge is strictly discretionary. *See United States v. McFadden*, 74 M.J. 87, 90 (C.A.A.F. 2015). Moreover, a military judge has "no duty [to excuse a member]." *Id.* A military judge's decision to sua sponte excuse a panel member is a "drastic action" that should be undertaken only in the interest of justice. *United States v. Velez*, 48 M.J. 220, 225 (C.A.A.F. 1998). We review a military judge's decision not to excuse sua sponte a member for actual or implied bias for an abuse of discretion. *Strand*, 59 M.J. at 458-60; *Akbar*, 74 M.J. at 395; *but see McFadden*, 74 M.J. at 90 (military judge has no duty to sua sponte excuse a panel member).[21]

### 1. Colonel DM's Presence in the Pentagon on September 11, 2001

During individual voir dire, COL DM stated he was previously assigned to the Pentagon as a member of the Joint Staff. On September 11, 2001, COL DM was present in the Pentagon when it was attacked. At the time the plane impacted the Pentagon, COL DM was about three corridors away from the point of impact. Colonel DM was not involved in the rescue operations, but re-entered the Pentagon several hours after the attack to manage the telecommunications systems staff. Colonel DM stated that the wife of one of his co-workers was killed in the attack. He did not personally know his co-worker's wife. The trial counsel asked COL DM if there was "[a]nything about [his] experiences on [September 11, 2001] that would cause [him] not to be fair and impartial." Colonel DM gave a negative response.

Appellant did not question COL DM about his experience in the Pentagon. However, appellant asked COL DM about an answer on his panel member questionnaire wherein COL DM expressed a "somewhat unfavorable" view of Sharia Law. In his exchange with appellant, COL DM explained he was comparing Sharia Law to a democratic form of government and felt Sharia Law conflicted with

---

[21] We recognize that applying an abuse of discretion standard to a military judge's decision not to sua sponte excuse a member pursuant to R.C.M. 912(f)(4) undermines the waiver language also found within that section. Nonetheless, we find the weight of our Superior Court's precedent rests on testing such decisions for abuse of discretion.

democratic values. Appellant did not conduct any further voir dire of COL DM and he did not challenge COL DM for cause.[22]

Appellate defense counsel now assert COL DM was biased because of his "deeply personal connection to terrorist attacks." We disagree that the record supports a finding of either actual or implied bias against COL DM. In regards to actual bias, COL DM thoroughly and candidly described his experience at the Pentagon on September 11, 2001. To the extent those experiences might amount to bias, COL DM unequivocally stated he could set aside his experience and be fair and impartial. The parties were in a position to see and hear COL DM's assurances of impartiality and determine his credibility. Neither appellant nor trial counsel lodged any objection. The military judge was in a similarly superior position to this court and she too expressed no concern about COL DM being biased. Accordingly, we find there was no actual bias. Therefore, the military judge did not abuse her discretion by not sua sponte excusing COL DM for actual bias.

Turning to implied bias, we find under the totality of the circumstances, most people similarly situated to COL DM would not be biased against appellant. We recognize being a victim of a similar offense can serve as grounds for disqualifying a potential member. *See Daulton*, 45 M.J. at 217 (C.A.A.F. 1996). However, in this case, we are not convinced COL DM's presence at the Pentagon when a group of foreign terrorists commandeered a commercial jet and crashed it into the building is sufficiently similar to appellant's small arms attack to warrant any concern as to implied bias. In any event, even assuming a similarity exists, a panel member is not per se disqualified merely because he has a personal familiarity with a similar crime. *Id*. In such instances, the crucial determination is whether the panel member can unequivocally disregard past experiences and consider solely the evidence presented in court. *See United States v. Smart*, 21 M.J. 15, 19 (C.M.A. 1985).

Colonel DM clearly and unequivocally stated his experience at the Pentagon on September 11, 2001, would not prevent him from being fair and impartial. Therefore, we find that a member of the public aware of all the facts, to include COL DM's responses, would not have substantial doubt as to the legality, fairness, and

---

[22] In his responses to the government's voir dire, COL DM expressed some hesitancy about the death penalty, indicating that "capital punishment is punishment from days gone by," and "there are probably better ways today to administer rehabilitation." He also agreed that he thought capital punishment was used too often in some states. Ultimately, he stated he could consider the full range of penalties, including the death penalty, if appellant were found guilty.

impartiality of appellant's trial. Accordingly, we find that the military judge did not abuse her discretion by not sua sponte excusing COL DM for implied bias.[23]

### 2. Lieutenant Colonel KG's Bumper Sticker

During individual voir dire, LTC KG stated he, at some point, had a bumper sticker on the back of his truck that read: "Major League Infidel." The bumper sticker was a gift from a friend and was on his vehicle for about one year. Lieutenant Colonel KG explained the bumper sticker was "[j]ust a morale decal. It seemed like a contemporary statement to be made, perhaps." Trial counsel then asked LTC KG about the bumper sticker:

> Q: Does putting that sticker in your back window, does that express any opinions you may have?
>
> A: Towards the enemy we were fighting.
>
> Q: Concerning that opinion, does that, in any way, affect your ability to be fair and impartial in this case?
>
> A: I don't think it does, sir, no.
>
> Q: You don't hold an opinion, based upon that bumper sticker, or any other reason you may have an opinion, that would preclude you from following the evidence in this case, considering the evidence in this case, and following the judge's instructions?
>
> A: No, sir.
>
> Q: Likewise, do you have any opinion, either based on that bumper sticker, or any other opinion you may have, that may stop you from being fair and open minded, and being able to consider all the evidence when deciding an appropriate sentence in this case ----
>
> A: No, sir.

---

[23] In their brief, appellate defense counsel also suggest COL DM was biased due to his holding a "somewhat unfavorable" opinion of Sharia Law. However, as with his presence in the Pentagon, COL DM explained he only felt Sharia Law conflicted with the ideals of democracy. There was no indication he held any such view about Islam in general. In any event, Sharia Law played absolutely no role in any phase of appellant's court-martial. Accordingly, we find the military judge did not abuse her discretion by not sua sponte excusing COL DM for either actual or implied bias due to his opinion of Sharia Law.

When trial counsel was finished, appellant, acting as his own counsel, asked LTC KG to define "major league infidel." Lieutenant Colonel KG stated, "[i]n short, somebody who stood against what the enemy believed in, I think. I look at it from an extremist viewpoint, not as a common Islamic viewpoint. It was meant directly towards the enemy extremists." Appellant then went on to question LTC KG about his understanding of Islam and his interactions with other Muslims. Lieutenant Colonel KG indicated he learned about Islam from a Muslim co-worker while serving in Canada. Lieutenant Colonel KG stated his co-worker would answer his general questions and that his co-worker had once explained the differences between Sunni and Shiite Muslims. However, when questioned by appellant, LTC KG could not articulate those differences. Appellant then ended his questioning of LTC KG. The military judge followed appellant to inquire briefly about LTC KG's exposure to pretrial publicity before terminating the questioning. At the conclusion of his voir dire, neither party challenged LTC KG for cause.

Appellant now argues the military judge was obliged to excuse LTC KG because his bumper sticker constituted actual bias. We disagree. The record clearly demonstrates LTC KG's bumper sticker was a comment on the enemies of the United States, rather than on appellant or his religion. Moreover, LTC KG clearly indicated nothing expressed on a bumper sticker would prevent him from being fair and impartial, fully considering the evidence presented, and following the military judge's instructions. *See United States v. Elfayoumi*, 66 M.J. 354, 357 (C.A.A.F. 2008) (noting the question of bias is not whether a member has particular views but whether they can put these views aside to evaluate the case on its merits).

Lieutenant Colonel KG was open and frank about the bumper sticker and responded to questions from both sides under the observation of the military judge. Having engaged with LTC KG and directly observed his responses, neither party challenged LTC KG for actual bias, or in any way expressed any concerns about bias. We therefore find the military judge did not abuse her discretion by not sua sponte excusing LTC KG for actual bias, because there was no actual bias.

With regard to implied bias, LTC KG presents a closer question. However, we are convinced that in light of all the facts, LTC KG's bumper sticker did not compel the military judge to take the drastic action of sua sponte excusing him from the panel. First, our Superior Court has held implied bias should rarely be invoked when there is no actual bias. *Warden*, 51 M.J. at 81-82. As discussed above, we are confident there was no actual bias on the part of LTC KG. Moreover, we assess the potential for implied bias under the totality of the factual circumstances. *Strand*, 59 M.J. at 459. Among those circumstances are statements of the panel member disavowing bias, which although not dispositive, can "carry weight." *United States v. Youngblood*, 47 M.J. 338, 341 (C.A.A.F. 1997) (citations omitted).

In this case, LTC KG's bumper sticker reflects only that he stood in opposition to the enemy against whom the armed force in which he served was engaged in conflict. From this perspective, LTC KG's opinion was likely not unique among his fellow panel members. This dynamic alone does not lead to an impermissible appearance of bias against appellant. Any such concerns were dispelled by LTC KG's answers on voir dire. He was transparent about the bumper sticker and willingly answered questions from both trial counsel and appellant. He openly explained what message he intended to convey with the bumper sticker and he explained directly to appellant what he believed it meant to be a "major league infidel." Lieutenant Colonel KG's frank explanation established that the bumper sticker was neither a comment on appellant nor his religion in general, but rather, only on "enemy extremists." Although LTC KG's knowledge of Islam was limited, nothing in the record suggests he was incapable of drawing that distinction.

Finally, LTC KG was unequivocal when stating he could be fair and impartial and that his bumper sticker would have no impact on his ability to participate in appellant's trial, to include following the military judge's instructions. Under all of these circumstances, we do not believe that most people in the same position would be biased against appellant. *Strand*, 59 M.J. at 459 (citing *Napolitano*, 53 M.J. at 167). Accordingly, we find that the military judge did not abuse her discretion by not sua sponte excusing LTC KG due to his bumper sticker.

### F. Whether the Military Judge Erred in Denying Appellant's Motions for Change of Venue Due to Pretrial Publicity and Heightened Security Measures

Appellate defense counsel assert the military judge committed error in denying defense's motions for change of venue. In pretrial litigation, appellant, still represented by counsel, submitted two motions requesting a change in venue. The first motion requested a change in venue and venire due to the panel's exposure to pretrial publicity. Therein, appellant argued, at a minimum, the panel was exposed to media reports from the date of the incident, 5 November 2009, until 6 July 2011, when the convening authority issued an order to the panel to avoid any publicity. The second motion requested a change of venue due to the heightened security measures at appellant's trial. The military judge denied both motions.[24]

We will first address the issue of pretrial publicity, and then we will discuss the security measures at appellant's trial. After thoroughly considering each asserted claim of prejudice independently and for any cumulative effect, we find no error.

---

[24] Defense requested reconsideration of both motions, which the military judge denied.

We review a military judge's decision to deny a change of venue for abuse of discretion. *United Sates v. Loving,* 41 M.J. 213, 282 (C.A.A.F. 1994) (citations omitted). "Anyone alleging an abuse of discretion faces an uphill climb." *United States v. Tsarnaev,* 968 F.3d 24 (1st Cir. 2020) (citing generally, *United States v. Rivera-Carrasquillo,* 933 F.3d 33, 44 (1st Cir. 2019) (holding a judge abuses his discretion "if no reasonable person could agree with the ruling."). Particularly in claims alleging jury partiality, "[t]he deference due to [the military judge] is at its pinnacle." *Id.* (citing *Skilling,* 561 U.S. 358, 396 (2010)).

### 1. Pretrial Publicity

"Servicemembers are entitled to have their cases 'adjudged by fair and impartial court-martial panels whose evaluation is based solely upon the evidence,' not pretrial publicity.'" *Akbar,* 74 M.J. at 398 (quoting *United States v. Simpson,* 58 M.J. 368, 372 (C.A.A.F. 2003)). The doctrine of unfair pretrial publicity is based upon the constitutional right to due process. *See* U.S. Const. amend. V; *Simpson,* 58 M.J. at 372. Pretrial publicity alone is insufficient to require a change of venue. *Id.* (citing *United States v. Curtis,* 44 M.J. 106, 133 (C.A.A.F. 1996)). Rather, an accused is entitled to a change of venue only if "pretrial publicity creates 'so great a prejudice against the accused that the accused cannot obtain a fair and impartial trial.'" *Akbar,* 74 M.J. at 398 (quoting *United States v. Loving,* 41 M.J. at 254 (citing R.C.M. 906(b)(11) Discussion)). An appellant bears the burden of demonstrating either presumed prejudice or actual prejudice.

### Presumed Prejudice

Prejudice may be presumed if the pretrial publicity is "(1) prejudicial, (2) inflammatory, and (3) has saturated the community." *Simpson,* 58 M.J. at 372 (citing *Curtis,* 44 M.J. at 139) (further citations omitted). "To establish saturation, 'there must be evidence of the amount of pretrial publicity and the number of individuals exposed to it.'" *Curtis,* 44 M.J. at 139 (citing *United States v. Gray,* 37 M.J. 730, 747 (A.C.M.R. 1992)). A conviction will not be overturned for presumed prejudice resulting from pretrial publicity unless there is a manifest injustice. *Id.* at 139 (citing *Mu'Min v. Virginia,* 500 U.S. 415 (1991)). In this case, we find appellant failed to meet his burden, at trial and on appeal, of establishing a presumption of prejudice.

On 6 July 2011, the GCMCA issued a memorandum to all prospective panel members detailed to appellant's court-martial. The memorandum provided the following direction:

> I instruct you to avoid all print, media, and internet coverage concerning this case and the accused. I further instruct you to in no way conduct any independent

research, electronic or otherwise, concerning this case or the accused. I also direct you not to discuss this case, the accused, or your selection as a panel member unless required to do so in the course of your official duties.

On 20 March 2012, a superseding order was issued to a new venire of prospective members containing nearly identical language. On 29 May 2012, the military judge issued a court order to all primary and alternate panel members selected for duty in appellant's case. Therein, the military judge instructed all prospective members as follows:

I instruct you to avoid all print, media, and internet coverage concerning the shootings which occurred at Fort Hood, Texas on 5 November 2009, this case and/or the accused. You must not read, view, or listen to any reports or coverage about the shootings, this case and/or the accused in the press, or on radio, television, or the internet. You should not take part in or engage in any discussions about any reports or coverage of this case. Should you inadvertently find yourself exposed to such reports, coverage or discussions, you must take immediate and reasonable steps to stop the exposure and report the exposure to the Chief of Military Justice, III Corps and Fort Hood. I further instruct you to in no way conduct any independent research, electronic or otherwise, concerning the shootings which occurred at Fort Hood, Texas on 5 November 2009, this case and/or the accused.

Appellant's motion for change of venue due to pretrial publicity and request for reconsideration occurred prior to voir dire. Appellant argues the "community," for purposes of evaluating media saturation, should be the limited pool of field grade United States Army officers eligible to serve as panel members in his court-martial. Accepting this claim as true, the military judge made the following findings:

Prejudice in the jury venire, and in this location, has not been shown and cannot be presumed. The publicity is not so inherently prejudicial that trial is presumed to be tainted before jury selection even begins. The presumption of prejudice attends only in extreme cases, and this is not that case.

The military judge acknowledged appellant's case had received considerable nationwide publicity, but found the "mere quantum of publicity in this case does not create presumed prejudice." She also found the local coverage was greater than

national coverage. The majority of the prospective members served at installations other than Fort Hood, thus tempering concerns the community was saturated.[25] Relying on *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Irvin v. Dowd*, 366 U.S. 717 (1961), the military judge found there was nothing in the content of appellant's pretrial publicity, such as disclosure of inadmissible evidence, that panel members could not be expected to disregard.

The military judge further noted the most recent publicity generally reported on the court proceedings and filings, as opposed to appellant's alleged crimes. Finally, the military judge found the passage of three years since the time of the alleged crimes was significant. *See Skilling*, 561 U.S. at 383. Accordingly, the military judge ruled the community from which appellant's panel was selected was not saturated by inflammatory and prejudicial pretrial publicity. However, the military judge left open the possibility of finding actual prejudice through the process of voir dire.

Appellant now asks us to infer, from a small sampling of voir dire and panel member questionnaire responses regarding pretrial publicity, that the military judge erred in finding no presumed prejudice.[26] We find much of the authority presented in support of appellant's argument for presumed prejudice is simply inapplicable in this case. Many of the cases relied upon by appellant find a presumption of prejudice where the actions of the government or court greatly exacerbated the degree of prejudicial pretrial publicity. We will briefly summarize these cases below, and then readily distinguish appellant's case.

First, in *Rideau*, the state allowed television broadcasts of the accused's custodial interrogation and inadmissible confession, thereby polluting the venire population with information no venireman would be able to set aside. 373 U.S. at 724-25. The Court was particularly concerned with the manner in which the accused's custodial interrogation occurred. *Id.* at 725. The video of the interview, which was broadcast to the local television station, depicted the accused "[i]n jail, flanked by the sheriff and two state troopers, admitting in detail the commission [of the charges], in response to leading questions by the sheriff." *Id.*

Next, in *Estes v. Texas*, the trial judge permitted the broadcasting of pretrial proceedings to the local community and failed to insulate prospective jurors and trial witnesses from their own public celebrity. 381 U.S. 532, 536 (1965). The Supreme

---

[25] No prospective panel member was assigned to Fort Hood either at the time of appellant's crime or at the time of trial. However, some prospective members had been assigned to Fort Hood in the intervening years.

[26] Appellant did not object to the composition of the final panel and did not renew his motion for change of venue following voir dire.

Court reversed the conviction, holding that "[i]n most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 542-543 (citing *In re Murchison*, 349 U.S. 133 (1955)).

As a final example, in *Sheppard v. Maxwell*, the Court presumed prejudice when the trial court, aware of intense pretrial publicity and slanderous reports regarding the accused and his counsel, denied the appellant the opportunity to explore bias during voir dire, and later failed to instruct the jury to ignore such outside influence. 384 U.S. 333, 362-63 (1966); *see also Tsarnaev*, 968 F.3d at 41 (finding trial judge failed to conduct a "thorough and searching voir dire" sufficient to assess the impact of pretrial publicity).

In marked contrast to *Rideau*, *Estes*, and *Sheppard*, there is no indication in appellant's case that the actions of the government or the court exacerbated pretrial publicity in any manner that might have unfairly prejudiced appellant. The convening authority twice issued orders for prospective panel members to avoid all publicity. The military judge issued a court order to all members to that same effect. *See, e.g., Simpson*, 58 M.J. at 373 (military judge ordered panel members to avoid media coverage of trial). As the date of trial drew near, the Chief of Military Justice followed up with a reminder to all prospective members that they must adhere to the orders to avoid exposure to publicity.[27] These measures all served to protect the impartiality of the potential panel members rather than amplify the risk of exposure to unfair pretrial publicity.

Moreover, having reviewed the entire record of trial, we find no indicia the pretrial publicity (although clearly extensive) was inaccurate or unfairly prejudicial in terms of its content. Based upon the record, we agree with the military judge's assessment that the volume of coverage was initially high, but subsided over the passage of almost three years until the time of appellant's trial. That passage of time likewise ameliorates our concerns of possible prejudice. *See, e.g., Skilling*, 561 U.S. at 383 (noting "decibel level of media" diminished in the years since the charged crime). We also concur with the military judge's finding that the coverage

---

[27] Appellate defense counsel further allege appellant suffered prejudice due to panel members' exposure to operational briefs, training presentations, and other administrative reports that assessed lessons learned from the shooting incident. We find no evidence panel members in appellant's case were exposed to such information. When asked in voir dire about the potential exposure, every panel member consistently responded that they adhered to the pretrial orders and removed themselves from those operational or training environments where the incident might be discussed. Without indicia of actual exposure, this argument lacks merit.

was more intense in the area around Fort Hood, a concern the convening authority alleviated by selecting panel members from installations across the country. *See, e.g., Loving*, 41 M.J. at 282 (convening authority detailed panel members who arrived at installation after the alleged crime occurred, or were assigned to other installations).

A presumption of prejudice based upon pretrial publicity "attends only the extreme case." *Skilling*, 561 U.S. at 381. We agree with the military judge that appellant's is not such a case, and we find no grounds for presuming appellant suffered prejudice from inflammatory and prejudicial pretrial publicity.[28] Accordingly, we find the military judge did not abuse her discretion in denying appellant's motion for change of venue and venire based upon presumed prejudicial pretrial publicity.

*Actual Prejudice*

Next, we to turn to whether appellant suffered any actual prejudice due to pretrial publicity.[29] In all but extreme circumstances, a showing of actual prejudice

---

[28] *See, e.g., Murphy v. Florida*, 421 U.S. 794 (1975). The Court in *Murphy* acknowledged in certain cases an accused may suffer a high level of notoriety. *Id.* at 803. However, the Court found that while there may be some indicia of potential bias due to pretrial publicity, that by "no means suggests a community with sentiment so poisoned against [appellant] as to impeach the indifference of [panel members] who displayed no animus of their own. *Id.* The Court reasoned:

> Qualified jurors need not, however, be totally ignorant of the facts and issues involved. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the jury can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

*Id.* at 799-800 (citing *Irvin*, 366 U.S. at 722-23). Similarly, we find the pretrial publicity in appellant's case insufficient to rebut the presumption of the panel members' impartiality.

[29] Following the military judge's ruling on presumed prejudice, the military judge advised the parties the case would continue to voir dire so that "any actual bias of any potential members based on pretrial publicity can be explored and tested at that

(continued . . .)

is necessary before a change of venue is granted. *Curtis,* 44 M.J. at 124. "To establish actual prejudice, the defense must show that members of the court-martial panel had such fixed opinions that they could not judge impartially the guilt of the accused." *Simpson,* 58 M.J. at 372 (citing *Curtis,* 44 M.J. at 139). The impact of pretrial publicity on the members "is determined by a careful and searching voir dire examination." *United States v. McVeigh,* 918 F. Supp. 1467, 1470 (W.D. Okla. 1996). It is the role of the trial judge "to realistically assess whether the jurors could be impartial." *Curtis,* 44 M.J. at 139 (citing *Mu'Min,* 500 U.S. at 430). A military judge should liberally grant challenges when there are questions about a panel member's ability to serve impartially. *See United States v. Clay,* 64 M.J. 274, 276-77 (C.A.A.F. 2007).

The pretrial panel questionnaire, jointly approved by the parties and the court, included several questions that required members to disclose their knowledge of the case and the accused, and then identify the source of any such knowledge.[30] The

---

(. . . continued)

time." Following voir dire, appellant challenged one member for cause, but did not exercise a preemptory challenge, and did not renew his motion for change of venue. Rule for Courts-Martial 912(f)(4) assigns an affirmative duty on parties to challenge questionable panel members, and failure to do so at trial constitutes waiver of the issue. However, for purposes of this appeal, we find appellant's pretrial motions for change of venue adequately preserved the issue on the grounds of both presumed and actual prejudice.

[30] The questions relating to pretrial publicity asked panel members how often they read newspapers, watch television news, listen to radio news, and read news on the internet. Panel members were asked to specifically state which national news networks and televisions talk shows they watch, and to which radio talk shows they listen. Panel members were further asked to specifically list what newspapers, magazines, journals, websites, or other periodicals they regularly read or subscribe to, both in print and online. Additionally, panel members were asked to specifically state what they had heard about appellant's case. Panel members were asked whether they had seen, heard, or read anything about appellant's case; how much they had heard; how closely they followed the news about appellant's case; from what sources they heard about appellant's case; whether they had ever listened to any commentator on the radio or television or read any internet columns, blogs, or tweets that discussed appellant's case; whether they had ever visited a website or other internet feature (chatrooms, discussion groups, or list serves) that discussed appellant or anything about this case; whether they read any government reports, books, documentaries, or special reports about appellant; whether they participated in any surveys or provided input for reports regarding appellant's attack; and

(continued . . .)

general format of the questionnaire for many of the questions was "check-the-block," format, but included designated space for narrative and open-ended responses.

Appellant's court-martial convened and general voir dire began on 9 July 2013. Twenty prospective members were present. The military judge performed general voir dire, and counsel for both parties were permitted time to do the same. During general voir dire, the military judge inquired extensively about the members' perception of media reporting in general. All prospective members agreed media reporting was not always completely accurate and truthful. Upon conclusion of general voir dire, appellant did not have any challenges for cause. The government challenged six members without opposition and the court released them. Of the remaining fourteen prospective members, nine returned for individual voir dire.

Appellant, proceeding pro se with the assistance of standby counsel, actively participated in individual voir dire. Appellant requested to conduct individual voir dire of one member and questioned others called by the government on areas of potential bias. All nine members were questioned about media exposure regarding the incident, the trial, and the accused, as well as the potential influence of media and information on their personal opinions as to appellant's guilt or innocence. All members indicated they would not be biased or otherwise influenced by any publicity. All agreed they had not formed inelastic opinions as to appellant's guilt and would fairly consider the evidence and follow the military judge's instructions.

Following individual voir dire, the military judge granted the government's request for four additional challenges for cause,[31] reducing the panel to ten members, which was below quorum pursuant to both Article 25, UCMJ, and the convening authority's panel appointment order, which required thirteen members. Accordingly, six additional members were produced for voir dire. General voir dire of the six new members included the same questions on media exposure and publicity as for the first group. Three of the six new prospective members were also questioned

---

(. . . continued)
whether they have read any articles in the *Army Times*, *Stars and Stripes*, or other military-oriented news source that discussed any military justice case, including appellant's case. Panel members were asked to "[d]escribe as completely as possible" what they have heard about the case and whether they trust or distrust the accuracy of what has been reported about appellant's case. In regards to sentence, panel members were asked whether they had read, seen, or heard an opinion expressed about appellant's case in terms of guilt and/or appropriate punishment.

[31] Appellant did not object to any of these challenges for cause.

individually by the military judge and the parties. Each individual voir dire touched upon media exposure to some extent.

After the second round of individual voir dire, the military judge granted the government's unopposed challenges for cause for two of the three new members who had participated in individual voir dire. The government exercised a preemptory challenge against the third. Appellant did not exercise a preemptory challenge. As a result, the remaining three members of the second group were all seated. At that point, thirteen members remained, which constituted a quorum based upon the convening authority's convening order. The military judge then excused the panel members, with instructions to avoid any media related to the trial, for approximately one month.

When the panel returned, the military judge called each member for further voir dire. The military judge individually asked each member several questions about their exposure to media and their ability to provide appellant a fair trial. No member revealed any significant exposure to pretrial publicity. Each member agreed they could set aside anything they might have heard about the case and give appellant a fair trial. After each member had been called for the additional round of individual voir dire, the military judge asked the parties if they had any further questions for any panel member. Neither party indicated they had any further questions. The military judge then allowed the parties to make additional challenges for cause. No challenges were made.

Although appellant proceeded pro se during voir dire, he was not alone in determining whether to challenge panel members. Appellant was assisted by standby counsel, who were ordered by the military judge to provide both legal research assistance and advice to appellant. Moreover, the military judge made generous allowances in the scope and method of voir dire. *See, e.g., Loving*, 41 M.J. at 257 (noting military judge allowed wide latitude to counsel during voir dire, "virtually no topic was off-limits"). The record demonstrates appellant was active during voir dire, conducting his own questioning based upon member questionnaires and engaging in exchanges with the military judge on challenges for cause.[32]

Finally, although not necessary, the military judge individually questioned each member who ultimately sat on appellant's panel about their exposure to pretrial publicity and their ability to set aside what they may have heard. *See, e.g, Mu'Min*, 500 U.S. at 431 (noting trial court's voir dire examination "was by no means perfunctory"). We find the voir dire conducted in appellant's case was sufficient to

---

[32] We note government counsel were vigilant as well, making several challenges for cause against members whose responses during voir dire indicated actual or implied bias.

uncover any "fixed opinions" of appellant's case that rose to the level of actual prejudice. *Akbar*, 74 M.J. at 398.

While every member had some prior knowledge of appellant's case, and in some instances more detailed knowledge, it is not necessary panel members be "totally ignorant of the case." *Curtis*, 44 M.J. at 139 (quoting *Mu'Min*, 500 U.S. at 431). Rather, the key question is whether any member has an opinion that will not yield to the evidence presented and the instructions of the court. In this case, questioning by counsel and the military judge did not reveal any fixed opinions as a result of exposure to pretrial publicity. Each member explicitly disavowed any impact from pretrial publicity. Each agreed they could set aside anything they might have heard and provide appellant a fair trial. At the conclusion of the military judge's questions, appellant was given a final opportunity to ask additional questions of any member or to exercise challenges for cause. Appellant declined both options.

Therefore, we cannot find the military judge abused her discretion in denying appellant's motion for a change of venue and venire on grounds of actual prejudice. Likewise, based upon our review of the record, we find no actual prejudice against appellant as a result of pretrial publicity.

*2. Heightened Security Measures*

In a separate assigned error, appellate defense counsel assert appellant suffered prejudice as a result of the heightened security measures in place at the court facilities on Fort Hood at the time of his trial. In some instances, security measures can "be so inherently prejudicial that they deprive an accused of the right to an impartial jury." *United States v. Miller*, 53 M.J. 504, 506 (A.F. Ct. Crim. App. 2000) (citing *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986)). However, not every security measure is "inherently prejudicial." *Id.* A trial judge's approval of security measures is afforded broad discretion. *Id.* (citing *Hellum v. Warden*, 28 F.3d 903, 907 (8th Cir. 1994)). If the challenged practice is not inherently prejudicial, then appellant must show actual prejudice. *Id.* at 507 (citing *Holbrook*, 475 U.S. at 572).

This court acknowledges that the physical security measures employed were considerable and obvious at the time of appellant's trial. Specifically, a barrier consisting of 180 shipping containers, varying between one and three stories in height, was constructed around the courthouse. We accept appellant's proffer that the members were aware of these measures. However, for the reasons set forth below, we find the military judge did not abuse her discretion in allowing increased security procedures. Appellant has not met his burden in demonstrating inherent prejudice or actual prejudice resulting from the increased security measures.

In a pretrial motion, appellant's defense counsel argued the barrier demonstrated the "general atmosphere of hostility and partiality against [appellant]." They also argued the barrier would prejudice the panel members by sending the message "[appellant] is the cause of such barriers and that their lives are at risk," and "that the charges against [appellant] are true and that he is a terrorist and murderer." The military judge directed the government to show cause why the high level of security was necessary. After hearing from the installation director of physical security, the military judge denied the motion for change of venue. The military judge found the measures were not directed at appellant but were designed to promote the safety of all court personnel. She also noted the level of security could well be the same at any other installation to which venue might be changed. Finally, she found no evidence that security would impact the panel and that appellant could receive a fair trial without a change of venue.

During the preliminary instructions to the members, the military judge explained that security precautions of varying degrees are part of any trial, depending on such matters as heightened media awareness or the number of spectators. She instructed the prospective members that it would be "unfair and inappropriate" to hold these measures against appellant, "when it has nothing to do with him at all." The military judge specifically advised the members:

> Security measures are implemented for the safety of all trial participants, and they in no way have any bearing on the accused's guilt or innocence. You should remain focused on the evidence that you will hear inside this courtroom, and disregard the security measures taken outside the courtroom. Do not consider those measures and precautions as evidence of anything, and do not permit it to enter into your view of the evidence or deliberations.

All members responded affirmatively that they understood and would follow these instructions. *See Loving*, 41 M.J. at 235 (citing *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991)) (noting panel members are presumed to follow the military judge's instructions). Appellant neither challenged these instructions by the military judge nor did he conduct voir dire of any member regarding his or her perception of the security at his court-martial.

To the extent the security measures were extreme, the record shows they were predominately outside the courtroom itself, and thus less likely to have a direct impact on the panel. *See, e.g., Holbrook*, 475 U.S. at 568-69 (finding shackling of accused in front of panel inherently prejudicial). Typically, security measures outside the courtroom, such as armed guards and metal detectors, are not inherently prejudicial. *See United States v. Miller*, 53 M.J. at 507 (citing *United States v. Darden*, 70 F.3d 1507, 1534 (8th Cir. 1995)). Although the security in this case

went well beyond armed guards and metal detectors, it was not so far outside the experience of the panel members, all of whom were career military officers, that it would engender any concerns of inherent prejudice. Accordingly, we agree with the military judge that there was no inherent prejudice due to security measures at appellant's trial.

We likewise find no evidence of actual prejudice as a result of the security measures employed at appellant's trial. As noted above, the military judge instructed the panel members that security measures were a part of every trial and that they were for the protection of all participants in the trial. She clarified they had nothing to do with appellant and should have no bearing on his guilt or innocence. All members agreed they could follow the military judge's instructions. The military judge then conducted extensive voir dire of the panel members and allowed both parties great range to conduct individual and group voir dire. Appellant elected not to conduct any voir dire related to security measures and he did not seek to challenge any panel member on that basis.

There is nothing in the record to rebut the presumption the panel members followed the military judge's instructions. *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991)). As there is no evidence any panel member harbored actual prejudice due to the security measures, the military judge did not err in denying the defense's motion.[33] Accordingly, we find no abuse of discretion in the military judge's denial of the defense's motion for change of venue due to pretrial publicity or heightened security at appellant's trial.

---

[33] Appellant suggests we order a post-trial evidentiary hearing to determine whether the security measures at his trial influenced the members of his panel. *See United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411 (1967). Our Superior Court recently addressed the standard for determining when a *DuBay* hearing is warranted, noting they "have long held that where a post-trial claim is inadequate on its face, or facially adequate yet conclusively refuted by the record, such a hearing is unnecessary." *United States v. Bess*, 80 M.J. 1, 13 (C.A.A.F. 2020) (quoting *United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002)). A *DuBay* hearing is neither necessary nor warranted when an appellant's claim on appeal rests on speculation due to a lack of effort to develop the relevant facts at trial. *Id.* (citing *United States v. Ingham*, 42 M.J. 218, 224 (C.A.A.F. 1995)). Here, appellant did not develop the issue of actual panel member bias due to security measures on the record; therefore, we find a *DuBay* hearing is neither warranted nor necessary. *See also United States v. Ginn*, 47 M.J. 236, 243 (C.A.A.F. 1997) (setting forth six principles for determining whether a fact-finding hearing is required).

*G. Whether this Court Can Conduct its Statutorily and Constitutionally Mandated Article 66 Review because Counsel Could Not Access the Entire Record of Trial*

During the course of appellant's trial, a number of documents and items of evidence were marked as appellate exhibits and viewed either in camera or ex parte by the military judge. There was also one closed session during the merits portion of the trial. *See* R.C.M. 806(b)(2). At the conclusion of the trial, the military judge issued an omnibus sealing order that placed many of the aforementioned exhibits, as well as the transcript of the closed session, under seal. The order provided the basis for sealing each category of document and authorized access to the sealed materials consistent with R.C.M. 1103A. In general, the documents placed under seal were panel member questionnaires which included personally identifiable information (PII); security plans and threat analysis compiled in anticipation of appellant's court-martial; autopsy photos containing patient medical information;[34] crime scene photos; and information protected by attorney client-privilege.[35]

As part of the investigation into appellant's crime, federal authorities obtained warrants related to appellant under the Foreign Intelligence Surveillance Act of 1978 (FISA). 50 U.S.C. § 1801 *et seq.* The warrants yielded several email exchanges between appellant and a foreign national named Anwar al-Aulaqi, who was linked to terrorism and was residing outside the United States. Prior to trial, the government gave appellant notice that it intended to offer evidence obtained from the FISA warrant. 50 U.S.C. § 1806(c). Appellant, who was still represented by counsel, then filed a motion with the military judge seeking access to review the underlying FISA material, or in the alternative, to have the court declare any derivative evidence inadmissible. In accordance with Section 1806(f) of the FISA statute, the military judge transferred the matter to the federal district court in Texas for review. *See* 50 USC § 1806(f).

The federal district court reviewed the material in camera and found the FISA warrant was properly authorized and executed. *United States v Hasan*, No. 12-MC-195, 2012 U.S. Dist. LEXIS 194450 (W.D. Tex. 14 Aug. 2012). The district court further found that disclosing the materials to appellant would pose a substantial

---

[34] *See* Health Insurance Portability and Accountability Act (HIPAA), Pub. L. 104-191, 110 Stat. 1936 (21 Aug. 1996).

[35] The sealed attorney-client privileged documents include motions and attachments filed by standby counsel regarding their role in appellant's trial, as well as the motion seeking to independently present mitigation as addressed above. The sealed attorney-client privileged information also contains documents related to the defense of others defense appellant sought to present to the panel and a memorandum from a defense witness who did not testify.

threat to the national security of the United States by damaging the government's ability to collect such information. *Id.* at *7. The district court therefore denied appellant's request for access to the FISA material. *Id.* at *12-13. The Federal Circuit Court of Appeals for the Fifth Circuit upheld the district court's decision. *United States v. Hasan*, 535 F.App'x 378 (5th Cir. 2013). Subsequently, the government declassified several emails between appellant and Anwar al-Aulaqi. Those documents were then provided to appellant through discovery. However, the government never admitted the emails obtained through the FISA warrants during either the merits or sentencing phases of trial.

When appellant's case came before this court for review pursuant Article 66, UCMJ, appellate defense counsel filed numerous motions seeking access to the sealed materials. Ultimately, this court granted appellate defense counsel access to the panel member questionnaires, the exhibits relating to security at appellant's court-martial, and to a number of the sealed documents containing crime scene photographs and medical information. *United States v. Hasan*, ARMY 20130781 (Army Ct. Crim. App. 6 July 2018) (order); *United States v. Hasan*, ARMY 20130781 (Army Ct. Crim. App. 31 August 2018) (order). However, with one limited exception, this court has denied appellate defense counsel access to those documents sealed pursuant to attorney-client privilege, or the work product doctrine, because appellant has not waived his privilege. *United States v. Hasan*, ARMY 20130781 (Army Ct. Crim. App. 16 October 2018) (order); *United States v. Hasan*, ARMY 20130781 (Army Ct. Crim. App. 18 Dec. 2019) (order).[36]

Appellate defense counsel now aver this court cannot conduct statutory and constitutional review of appellant's case because appellate defense counsel have been denied access to the FISA material and to those matters protected by the attorney-client privilege. Counsel also argue they cannot provide effective assistance of counsel on appeal without accessing the information in question. We disagree.

As to the FISA material, appellant has articulated no basis upon which this court could grant relief. At trial, appellant's request for access to the FISA material, as well his motion to suppress that evidence, were litigated in the proper forum according to the R.C.M. and the applicable federal statute. *Hasan*, 535 F. App'x

---

[36] After this court denied appellate defense counsel access to matters sealed by the military judge as being privileged between appellant and his standby counsel, appellate defense counsel petitioned the Court of Appeals of the Armed Forces (CAAF) for extraordinary relief in the nature of a writ of mandamus. The CAAF denied appellate defense counsels' petition on the grounds that appellate defense counsel failed to establish a clear and indisputable right to the writ. *Hasan v. United States Army Court of Criminal Appeals*, 2019 CAAF LEXIS 274 (18 April 2019).

378. To the extent appellant is asserting that decision is error, we find that any possible recourse does not lie with this court. *See United States v. Horton*, 17 M.J. 1131, 1133 (N.M.C.M.R. 1984) (holding Navy-Marine Court of Military Review does not have jurisdiction to hear challenges to the constitutionality of Section 1806(h) of the FISA statute); *United States v. Ott*, 26 M.J. 542, 545 (A.F.C.M.R. 1988).[37]

We further find that even if the federal district court erred, appellant suffered no prejudice. Ultimately, the government did not admit the declassified emails, nor any other evidence obtained through the FISA warrant. The emails that were not admitted at trial are included in the allied documents to the record of trial. As such, the declassified emails are available for review by appellate defense counsel, as well as this court. Having reviewed the entirety of the record, we find no indication the government relied upon any information or evidence derived from the FISA warrant in securing appellant's convictions and sentence. Accordingly, we hold that appellant's claim regarding the FISA materials lacks merit and provides no basis for any relief.

As to the sealed materials protected by the attorney-client privilege, we also find appellant is not entitled to any relief. Appellate defense counsels' requests for access to the sealed attorney-client privileged material have been vigorously litigated before this court. Rather than challenge those previous rulings, appellate defense counsel now argue they cannot provide effective assistance of counsel on appeal without access to the sealed material. We disagree.

Military Rule of Evidence 502(a) governs attorney-client privilege in courts-martial.[38] The time-honored privilege is ultimately controlled by the client. *United*

---

[37] We note that federal courts have consistently held the procedures defined in the FISA statute do not violate the Constitution. *See United States v. Islamic American Relief Agency*, 2009 U.S. Dist. LEXIS 118505, *9 (W.D. Mo. 21 December 2009) (noting "[t]he constitutionality of FISA's provisions regarding the court's ex parte, in camera review procedures have been affirmed by federal courts . . . .") (citing *United States v. Isa*, 923 F.2d 1300, 1303 (8th Cir. 1991)); *United States v. Damrah*, 413 F.3d 618, 624 124 Fed. Appx. 976 (6th Cir. 2005)).

[38] Military Rule of Evidence 502(a) provides that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional services to the client" between a client and the lawyer and between lawyers representing the client. *See also* Army Reg. 27-26, Rules of Professional Conduct

(continued . . .)

*States v. Romano*, 46 M.J. 269 (C.A.A.F. 1997) (citing 8 Wigmore Evidence § 2292 at 554 (McNaughton rev. 1961)). As such, in the absence of an applicable exception, information protected by the privilege cannot be disclosed without the consent of the client. R.C.M. 502. In this case, the military judge reviewed the documents, which were submitted ex parte or provided in the closed ex parte hearing, and determined they were protected by attorney-client privilege. *See* R.C.M. 502; *United States v. Zolin*, 491 U.S. 554, 569 (1989) (approving of the practice of in camera inspection to determine whether disclosure is warranted). Appellant was given the opportunity at trial to waive privilege; however, he declined to do so. Accordingly, the military judge appropriately placed the documents under seal before adding them to the record of trial. *See, e.g., United States v. Branoff*, 38 M.J. 98 (C.M.A. 1993) (citing *United States v. Roberts*, 793 F.2d 580, 588 (4th Cir. 1986)); *see also* MCM, 2012, R.C.M. 1103A; *MCM*, 2019, R.C.M. 1113(b)(3)(B)(ii).[39]

Appellate defense counsel have moved this court to grant them access to review the attorney-client privileged documents for purposes of this appeal. This court reviewed the documents in question in camera. We denied appellate defense counsels' motions to review the privileged documents because appellate defense counsel have not identified an applicable exception under Mil. R. Evid. 502(d) which would authorize disclosure absent appellant's consent.[40] To date, appellant

---

(. . . continued)
for Lawyers, Rule 1.6 (28 June 2018) (Confidentiality of Information); American Bar Association's Model Rules of Professional Conduct 1.6 (Confidentiality of Information) (2020).

[39] Rule for Courts-Martial 1113 was modified by the 2018 Amendments to the *MCM*, and except as otherwise noted above, did not substantively change in language, which in prior iterations was referenced as R.C.M. 1103A. *See MCM*, 2019, Appendix 15, ¶ A15-22.

[40] Military Rule of Evidence 502(d) provides five exceptions to the attorney-client privilege: (1) "[i]f the communications clearly contemplated the future commission of a fraud or crime . . . ;" (2) "[c]ommunications relevant to an issue between parties who claim through the same deceased client . . . ;" (3) "[c]ommunications relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer;" (4) "[c]ommunications relevant to an issue concerning an attested document to which the lawyer is an attesting witness;" and (5) "[c]ommunications relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients."

has not waived his attorney-client privilege with regard to those documents.[41] *See United States v. Dorman*, 58 M.J. 295, 298 (C.A.A.F. 2003) (appellate counsel must obtain client's consent to release attorney-client protected information). Accordingly, the documents are unavailable to counsel for purposes of their representation of appellant before this court. *See Romano*, 46 M.J. at 275 (sealed documents not ordered released by a court of criminal appeals shall remain under seal).

Appellate defense counsel cite no authority for the proposition that their performance can be judged ineffective on the basis of material which a lawful court order prohibits them from viewing. In fact, the precedent of our Superior Court is directly to the contrary. *See United States v. Rivers*, 49 M.J. 434, 438 (C.A.A.F. 1998) (appellant not denied effective appellate review where counsel were prevented from reviewing sealed materials). Accordingly, we find appellate defense counsels' concerns about ineffective assistance of counsel to be without merit.

Finally, appellate defense counsels' contention that this court cannot perform its Article 66, UCMJ, review because certain documents remain under seal is also without merit. Article 66, UCMJ, requires this court to affirm only such findings of guilt or sentence as we find correct in law and fact based upon the entire record. Rule for Courts-Martial 1103 requires all matters presented to the trial court, even those not ultimately admitted, be placed in the allied documents to the record of trial. This requirement does not conflict with the long-standing premise that the trial court, either upon request, or for good cause, may seal matters at its discretion. Nor does the military judge's sealing order prohibit this court from reviewing the sealed documents. The military judge's sealing order specifically states that reviewing authorities, such as this court, are allowed to examine the sealed attorney-client privileged material. *See Branoff*, 38 M.J. at 103-04 (indicating that judge's order controls access). Such access is consistent with R.C.M. 1103A(b)(4), *MCM*,

---

[41] This court ordered appellant's trial defense counsel to provide appellate defense counsel privileged documents for which appellant waived privilege due to his disclosure of those matters to a third party. *United States v. Hasan*, ARMY 20130781 (Army Ct. Crim. App. 17 May 2019) (order) (citing Mil. R. Evid. 510(a); *In re Itron, Inc.* 883 F.3d 553, 558 (5th Cir. 2018)).

2012,[42] and R.C.M. 1113(b)(3)(B)(ii), *MCM*, 2019,[43] which independently grant this court access to sealed materials when necessary to carry out our review function under the UCMJ.

In this case, we find that access to the sealed materials was necessary to complete our mandate pursuant to Article 66, UCMJ. *See Rivers*, 49 M.J. 434, 437-38 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)); *see also Romano*, 46 M.J. at 275. We recognize our review may suffer from the absence of adversarial testing because independent review is not the equivalent of assistance of counsel. *See Rivers*, 49 M.J. at 437 (citing *United States v. Ortiz*, 24 M.J. 323, 325 (C.M.A. 1987)). However, we find this is a case where the needs of appellate defense counsel must yield to the status of the privilege to be protected. *See id.* at 437-38 (citing *Ritchie*, 480 U.S. at 59; *United States v. Nixon*, 418 U.S. 683, 706 (1974)). Accordingly, we have reviewed the sealed materials in camera and we find nothing contained therein affects the legal or factual correctness of the findings or sentence in appellant's case. *See id.* (citing *Ritchie*, 480 U.S. at 60-61). Accordingly, appellant's request for relief on this basis is denied.

## CONCLUSION

On consideration of the entire record, we AFFIRM the findings of guilty and the sentence.

Chief Judge (IMA) KRIMBILL and Judge RODRIGUEZ concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[42] Rule for Courts-Martial 1103A(b)(4) (2012 ed.) authorizes reviewing and appellate authorities to examine sealed matters when determined "[t]hat such action is reasonably necessary to a proper fulfillment of their responsibilities under the [UCMJ, *MCM*], governing directives, instructions, regulations, applicable rules for practice and procedure, or rules of professional responsibility."

[43] Rule for Courts-Martial 1113(b)(3)(B)(ii) (2019 ed.) authorizes examination by reviewing and appellate authorities of sealed matters reviewed by a military judge, not released to trial counsel or defense counsel.